In re The JULIEN COMPANY, Debtor.

BLUEBONNET WAREHOUSE CORPORATION, Plaintiff,

v.

The JULIEN COMPANY; Jack F. Marlow, Trustee; Bankers Trust Company; Bank Mees & Hope, N.V.; Bank One, Texas, N.A.; Amsterdam–Rotterdam Bank, N.V.; French American Banking Corporation; Bayerische Vereinsbank A.G. (Union Bank of Bavaria) New York Branch and Team Bank, (Hereinafter "Institutional Lenders"), Defendants.

TEXAS COMPRESS AND WAREHOUSE CORPORATION; North Plains Compress; Corpus Christi Public Compress; National Diversified Company; Tri County Warehouse Company; Sweetwater Compress, Inc., Plaintiffs,

v.

The JULIEN COMPANY; Jack F. Marlow, Trustee; and Institutional Lenders, Defendants.

FRANKLIN COTTON WAREHOUSE, Plaintiff,

v.

The JULIEN COMPANY; Jack F. Marlow, Trustee; and Institutional Lenders, Defendants.

DELTA CO–OP COMPRESS AND WAREHOUSE, Plaintiff,

v.

The JULIEN COMPANY; Jack F. Marlow, Trustee; and Institutional Lenders, Defendants.

PLAINVIEW CO–OP COMPRESS, INC., Plaintiff,

v.

The JULIEN COMPANY; Jack F. Marlow, Trustee; and Institutional Lenders, Defendants.

GULF COMPRESS, Plaintiff,

v.

The JULIEN COMPANY; Jack F. Marlow, Trustee; and Institutional Lenders, Defendants.

FARMERS COOPERATIVE COMPRESS, Plaintiff,

v.

The JULIEN COMPANY; Jack F. Marlow, Trustee; and Institutional Lenders, Defendants.

TAYLOR COMPRESS, A DIVISION OF TEXAS COTTON GROWERS COOPERATIVE ASSOCIATION, Plaintiff,

v.

The JULIEN COMPANY; Jack F. Marlow, Trustee; and Institutional Lenders, Defendants.

LEVELLAND COMPRESS COMPANY, INC., Plaintiff,

v.

The JULIEN COMPANY; Jack F. Marlow, Trustee; and Institutional Lenders, Defendants.

The TRINITY COMPANY and West Texas Industries, Inc., Plaintiff,

v.

The JULIEN COMPANY; Jack F. Marlow, Trustee; and Institutional Lenders, Defendants.

POSTEX WAREHOUSE, Plaintiff,

v.

The JULIEN COMPANY; Jack F. Marlow, Trustee; and Institutional Lenders, Defendants.

Bankruptcy No. 90–20283–B(mjn). Adv. Nos. 90–0051, 90–0065, 90–0066, 90–0138 to 90–0142, 90–0144, 90–0145 and 90–0250.

United States Bankruptcy Court, W.D. Tennessee, W.D.

Feb. 14, 1992.

John L. Ryder, Apperson, Crump, Duzane & Maxwell, Memphis, Tenn., for Amsterdam–Rotterdam Bank, N.V.

Jack F. Marlow, Chapter 11 Trustee, Memphis, Tenn.

J. David Blaylock, Memphis, Tenn., for trustee.

Julie C. Chinn, Asst. U.S. Trustee, Memphis, Tenn.

Charles T. Swayze, Jr., James Y. Dale, Greenwood, Miss., for Franklin Cotton Warehouse, Texas Compress and Warehouse, North Plains Compress, Corpus Christi Public Compress, Nat. Diversified Co., Tri County Warehouse Co., Sweetwater Compress, Inc. and Bluebonnet Warehouse.

Greg Teeter, Law Offices of Jack McClendon, Lubbock, Tex., for Levelland Compress Co., Inc.

Douglas W. Wilkerson, Wilkerson & Stafford, Dyersburg, Tenn., for Team Bank.

James F. Gleason, Jr., Hertzog, Calamari, Gleason, New York City, for Bayerische Vereinsbank A.G.

Barry Radick, Risa M. Rosenberg, Milbank, Tweed, Eadley & McCloy, New York City, for Bank Mees & Hope, N.V.

William J. Lowy, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for French American Banking Corp.

Deborah J. Greer, Robert C. Wolter, Corpus Christi, Tex., for Delta Co-op Compress & Warehouse, Plainview Co-op Compress, Inc., Gulf Compress, Farmers Co-op Compress and Taylor Compress.

Tommy J. Swann, McClesky, Harringer, Brazill & Graf, Lubbock, Tex., for the Trinity Co. and West Texas Industries, Inc.

Robert W. St. Clair, Curry, Curry & Robinson, Lubbock, Tex., for Postex Warehouse.

William J. Landers, Memphis, Tenn., for Bankers Trust Co.

C. Wade Cooper, Jackson & Walker, Dallas, Tex., for Bank One, Texas, N.A.

**768**

### MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT

WILLIAM H. BROWN, Bankruptcy Judge.

These proceedings [1] are before the Court on cross motions for partial summary judgment filed by the above named parties to these adversary proceedings. Essentially, at issue is whether the plaintiff-warehousemen ("plaintiffs") hold general liens on the proceeds of cotton which was in their possession at the time The Julien Company's ("debtor") bankruptcy petition was filed. The following constitutes findings of fact and conclusions of law pursuant to F.R.B.P. 7052 and 7056.

The record reflects that the debtor's bankruptcy case was commenced with the filing of an involuntary Chapter 7 petition on January 10, 1990. The case was converted to one under Chapter 11 on January 11, 1990, and Jack F. Marlow was subsequently named trustee of the Chapter 11 estate.

Prior to commencement of the bankruptcy case, the debtor was in the business of buying and selling cotton. The debtor's business was largely financed by the institutional lenders named as defendants in these adversary proceedings. As such, the lenders assert security interests in virtually all the debtor's assets existing at the case's inception. Among the assets existing at inception of the case were bales of cotton stored in the warehouses involved in these proceedings. The plaintiffs assert liens on this same cotton, or its proceeds, for charges arising out of the storage and handling of all of the debtor's cotton.

Following his appointment as trustee, Mr. Marlow ("Trustee") was authorized to liquidate the debtor's inventory pursuant to the Court's "Order Authorizing The Trustee To Sell Property Of The Estate Free And Clear Of Liens" entered on February 15, 1990. After liquidation of the inventory, the plaintiffs were paid their "bale specific" charges, which are charges for services performed with regard to the specific cotton in storage at the time the bankruptcy case was commenced. The balance of the proceeds has been paid provisionally to the institutional lenders.

In addition to authorizing liquidation of the debtor's cotton, the February 15, 1990, order reserved all rights of the parties and provided for the filing of complaints to enforce such rights. Thus, the plaintiffs initiated the instant adversary proceedings to enforce their asserted "general liens" or liens asserted upon the cotton in storage at commencement of the case for charges for services related to cotton shipped prior to commencement of the case.

In response to the plaintiffs' complaints, the institutional lenders filed a "Joint Motion for Partial Summary Judgment." According to the institutional lenders, the plaintiffs, as a matter of law, have not properly reserved general liens in accordance with applicable law.

The plaintiffs responded to this motion with cross motions for partial summary judgment, asserting that they had in fact properly reserved liens as evidenced by the language of the warehouse receipts representing the cotton at issue. In the alternative, the plaintiffs contend that they are entitled to legal or equitable setoff of the amounts due them, are entitled to general liens under an equitable "color of lien" theory, or are entitled to recoupment as a matter of law. The institutional lenders dispute the alternative grounds for relief asserted by the plaintiffs, contending each is meritless.

Therefore, the Court is asked to determine whether the following issues may be resolved as a matter of law:

(1) Whether the plaintiffs' warehouse receipts reflect properly reserved general liens in accordance with applicable law;

(2) Whether the plaintiffs are entitled to legal setoff of the amounts due them;

(3) Whether the plaintiffs are entitled to equitable setoff of the amounts due them;

---

1. These proceedings are "core" pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (K).

(4) Whether the plaintiffs are entitled to recoupment of the sums due them for charges related to all of the debtor's cotton; and

(5) Whether the plaintiffs are entitled to recover under a "color of lien" theory.[2]

The parties have filed affidavits, exhibits, and extensive memoranda in support of their respective positions. For purposes of resolution of the issues raised by the motions and cross motions only, the institutional lenders assume the facts alleged by the plaintiffs to be true. Based on the fact that only the issues enumerated above are to be resolved with this memorandum, the Trustee adopts the positions and reasoning therefore asserted by the institutional lenders.

Examination of the pleadings, memoranda, affidavits and exhibits submitted in these proceedings has led the Court to conclude that the issues of whether the warehouse receipts' language properly reserves a general lien and whether the plaintiffs are entitled to setoff are governed by statutes. The remaining issues are governed by applicable case law.

The plaintiff warehousemen whose asserted liens are at issue in this memorandum are licensed by the states in which they are located. All except Franklin Cotton Warehouse, which is licensed by Louisiana, are licensed by the state of Texas.

## SUMMARY JUDGMENT

The general standard for summary judgment in the bankruptcy context is found at F.R.B.P. 7056(c):

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

This standard does not allow the "mere existence of some alleged factual dispute between the parties [to] defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (emphasis in original). The substantive law governing the case will determine what issues of fact are material and the proper inquiry is the same as that used on federal directed verdict motions, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir.1989).

Given these mandates, it is the Court's task to determine whether the evidence presented in these proceedings is "so one sided that one party must prevail as a matter of law." *Id.*

## STATUTORY CONSTRUCTION

As mentioned above, the Court has determined that the general lien reservation and setoff issues are governed by statutes. Therefore, consideration of the rules governing statutory construction is appropriate at this juncture.

A review of recent case law emanating from the Supreme Court and Court of Appeals for the Sixth Circuit[3] reveals an emphasis on application of the "plain meaning rule" to statutes which appear unambiguous. *See, e.g., U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *In re C.L. Cartage Co., Inc.*, 899 F.2d 1490 (6th Cir.1990). Strictly stated, the "plain meaning rule" stands for the proposition "that, if a literal construction of an unambiguous statute does not produce an absurd or futile result, then it is inappropriate for a court to examine extra statutory materials in an effort to determine the 'legislative intent' of the statute." *In re Idalski*, 123 B.R. 222, 225

---

**2.** It should be noted that each plaintiff has adopted the defenses and positions of the other plaintiffs.

**3.** Under the doctrine of *stare decisis,* this Court is obligated to follow the precedent set by these Courts.

(Bankr.E.D.Mich.1991); *U.S. v. Ron Pair Enterprises, Inc.*, 109 S.Ct. at 1030–31.

However, at the same time that it endorses the "plain meaning rule," the Supreme Court has apparently not ruled out review, for example, of the legislative history of a statute whose meaning is "plain" to determine whether "literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *U.S. v. Ron Pair Enterprises, Inc.*, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). Neither has the Court excluded consideration of legislative history or extra statutory materials when such would aid construction of the words used in the statute "however clear the words may appear on 'superficial examination.'" *In re Sinclair*, 870 F.2d 1340, 1342 (7th Cir.1989), (quoting *United States v. American Trucking Association, Inc.*, 310 U.S. 534 at 543–44, 60 S.Ct. 1059 at 1064, 84 L.Ed. 1345 (1940)); (citing *Train v. Colorado Public Interest Research Group, Inc.*, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976); *California Federal Savings & Loan Assoc. v. Guerra*, 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987)).

■ From these directives, it appears that although unambiguous statutes must be applied according to their terms, the Court need not refuse to consider extra statutory evidence to aid in construction of those terms or to prevent a result at odds with the intention of their drafters. The Court makes this observation as a prelude to its analysis of the plaintiffs' arguments advanced in support of the contention that their warehouse receipts adequately reflect general liens. As will be shown, the authority referred to above allows the Court to consider all of the plaintiffs' arguments in conducting its analysis.

## WAREHOUSE RECEIPTS

As noted above, the plaintiffs whose claims are under consideration here are licensed by the respective states in which they are located. As such, state law is dispositive of whether the warehouse receipts reflect properly reserved general liens. Each state involved in these proceedings has enacted Article 7 of the Uniform Commercial Code ("UCC"). Therefore, the Court's task with respect to this issue is one of construction of the specific relevant UCC statutes and application of such to the language of the warehouse receipts.

As argued by the plaintiffs, Article 7 of the UCC authorizes warehousemen to assert and claim a general lien. This authorization is found at UCC § 7–209 as follows:

A warehouseman has a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation (including demurrage and terminal charges), insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law. *If the person on whose account the goods are held is liable for like charges or expenses in relation to other goods whenever deposited and it is stated in the receipt that a lien is claimed for charges and expenses in relation to other goods, the warehouseman also has a lien against him for such charges and expenses whether or not the other goods have been delivered by the warehouseman.*[4] But against a person to whom a negotiable warehouse receipt is duly negotiated a warehouseman's lien is limited to charges in an amount or at a rate specified on the receipt or if no

---

**4.** It should be noted here that the Louisiana legislature has adopted a stylistically different version of this section. In pertinent part that statute provides: "…. If the person on whose account the goods are held is liable to the warehouseman for like charges or expenses in relation to other goods and it is stated in the receipt that a lien is claimed for such charges and expenses, the warehouseman also has a lien against the goods covered by the receipt for such other charges and expenses whether or not the other goods have been delivered by the warehouseman …" See, La.Rev.Stat. § 10:7–209. These stylistic differences do not change the requirements and effect of the UCC version of § 7–209 as quoted.

charges are so specified then to a reasonable charge for storage of the goods covered by the receipt subsequent to the date of the receipt.

(emphasis added)

This Court has previously found the language of this statute to be "clear and unambiguous." *See, Western Cotton Services Corp. v. Jack F. Marlow, Trustee, et al., (In re The Julien Company)*, 136 B.R. 743, 752 (Bankr.W.D.Tenn.1991). As such, reference to extra statutory materials for its meaning is unnecessary unless such materials would aid in construction of the statute's terms or prevent results at odds with the drafters' intentions. *See, e.g., U.S. v. Ron Pair Enterprises, Inc.*, 109 S.Ct. at 1031.

■ Clearly, the terms of UCC § 7–209, when ascribed their ordinary natural meanings, dictate that warehousemen may in fact assert a lien on goods in their possession for like charges or expenses in relation to other goods received from the same depositor if a warehouse receipt was issued [5] and "if ... it is stated in the receipt that a lien is claimed for charges and expenses in relation to other goods" whether or not the other goods have been delivered elsewhere. UCC § 7–209. Thus, the issue becomes whether the receipts in the instant proceedings comply with that statutory mandate.[6]

Copies of representative warehouse receipts have been submitted as exhibits in these proceedings. They respectively contain the following pertinent language:

A. *Bluebonnet Warehouse Corporation*

(Adv. No. 90–0051):

... Said Bale of Cotton described herein stored in the above mentioned warehouse will be delivered to bearer upon surrender of this receipt and payment of all charges ... A lien is reserved by the

undersigned for storage handling and other charges as per contract and lease with the industry served the amount of which is unknown at this time ...

and

... A lien of the said one bale of cotton is hereby reserved for all charges accrued and to accrue under the certificated tariff in use by the warehouseman as approved and published N.Y. Cotton Exchange Inspection Bureau Agency the exact accrued amount of which is unknown at this time. Accrued charges on cotton in storage are due on July 31st of each year and must be paid to avoid penalty ... upon surrender of this receipt and payment of all charges due the warehouseman, the said one bale of cotton will be delivered to the bearer.

(Response of Certain Warehousemen ..., Ex. A)

B. *Texas Compress and Warehouse Corporation*

(Adv. No. 90–0065)

... One bale of Cotton Described Herein. Deliverable only upon return of this receipt and payment of all storage and service charges accruing under tariffs issued by this warehouse ...

(Response of Certain Warehousemen ..., Ex. P)

C. *North Plains Compress*

(Adv. No. 90–0065)

... A lien on the cotton described herein is hereby reserved for all charges accrued and to accrue under the tariff of the undersigned ... and for all lawful claims for money advanced, interest, transportation, labor and other charges and expenses, the exact accrued amount of which is unknown at this time. Accrued charges on cotton in storage on July 31 are payable on said date ... All charges must be paid on cotton notwithstanding loss of or damage to the same. Upon surrender of this receipt and pay-

---

5. *See, e.g., In re Knoware, Inc.*, 57 B.R. 163 (Bankr.D.Mass.1986); *In re Charter Co.*, 56 B.R. 91 (Bankr.M.D.Fla.1985).

6. There is apparently no dispute here over whether the cotton was "deposited" or whether

the charges and expenses in relation to the previously shipped cotton are "like" the charges and expenses specified in the first sentence of UCC § 7–209.

ment of all charges, the said one bale of cotton will be delivered to the BEARER.

(Response of Certain Warehousemen ..., Ex. I)

### D. *Corpus Christi Public Compress*
(Adv. No. 90–0065)

... Bonded warehouse receipt for one bale of cotton ... Said cotton is deliverable to bearer upon return of this receipt and payment of all storage and service charges accruing under tariffs issued by this company.

This cotton is stored for concentration and compression. Any prior liens are unknown to us. A lien is reserved for all storage and service charges accruing under Tariffs of this Company, and for all other lawful charges, the amount of which is unknown at this time ...

(Response of Certain Warehousemen ..., Ex. B)

### E. *National Diversified Company*
(Adv. No. 90–0065)

... Received one bale of cotton for storage ... Upon surrender of this receipt and payment in cash of a lien and/or any other charges for services requested according to the tariff in effect on the date such services are requested or performed, the warehouseman will deliver said cotton to the BEARER.

This warehouse receipt is issued subject to the printed tariff of the company together with the rules of such tariff, a copy of which is posted in the office of said warehouseman. The rates in said tariff are made a part of this contract and the undersigned warehouseman claims a lien on said cotton for charges and liabilities as per schedule set out in said tariff ...

(Response of Certain Warehousemen ..., Ex. H)

### F. *Tri County Warehouse Company*
(Adv. No. 90–0065)

One bale of cotton described herein, ... The undersigned warehouseman is not the owner of the cotton, covered by this receipt, ... The undersigned warehouseman claims a lien for advances, liabilities, and charges according to tariff ... Upon the return of this receipt and

the payment of all charges and liabilities due the undersigned warehouseman, said cotton will be delivered to bearer ... The warehouseman claims a lien for services as follows:

Receiving, weighing, sampling and handling, storage and insurance per month or faction thereof ...

All charges according to tariff in effect and any other charges for services requested according to the tariff in effect on the date such services are performed. Full amount of charges furnished on request.

(Response of Certain Warehousemen ..., Ex. Q)

### G. *Sweetwater Compress, Inc.*
(Adv. No. 90–0065)

... This warehouse receipt is issued subject to the printed tariff of the Company together with the rules attached to each tariff, a copy of which is posted in the office of said warehouseman. The rates in said tariff are made a part of this contract and the undersigned warehouseman claims a lien on said cotton for charges and liabilities as per schedule set out in said tariff ...

Upon request of this receipt and payment of all charges and liabilities due the undersigned warehouseman as may be accrued at time of presentation, said One Bale of Cotton will be delivered to the above named depositor or his order, or bearer.

(Response of Certain Warehousemen ..., Ex. Mc)

### H. *Franklin Cotton Warehouse*
(Adv. No. 90–0066)

... The undersigned warehouseman is not the owner of the cotton covered by this receipt ... Demand for payment of all accrued charges for payment of all accrued charges maybe made at the close of each cotton season[.] Upon surrender of this receipt and the payment of all liens due the warehouseman, said cotton will be delivered to the BEARER.

The warehouseman claims a lien for services as follows ... and any charges for services requested according to the tariff

in effect on the date such services are performed. Full amount of charges furnished on request.

(Response of Certain Warehousemen ..., Ex. D)

### I. Delta Co–Op Compress & Warehouse
(Adv. No. 90–0138)

Said one bale of cotton deliverable to bearer upon return of this receipt and payment of all charges accruing under published tariffs issued by this corporation ... any prior liens are unknown to us. A lien is reserved for all storage and service charges accruing under tariffs of this corporation, and for all other lawful charges, the amount of which is unknown at this time.

(Delta Co–Op Compress and Warehouse's Motion ..., Ex. Unnumbered, Affidavit of D.E. Orendorf, p. 11)

### J. Plainview Co–Op Compress, Inc.
(Adv. No. 90–0139)

The one bale of cotton described herein to be delivered to bearer upon return of this receipt and payment as proceeds of the original depositor's sale of the amount of all advances, charges and liabilities incurred which are due the undersigned association as warehouseman ... the association, on behalf of its producers patrons who deliver cotton to the warehouse, claim a lien on the cotton represented hereby against the holder of this receipt for sales proceeds in the amount of all advances made and liabilities incurred and all lawful charges for storage, compression, transportation, ... or other charges present or future in relation to the cotton at the rate of the association's tariff and for expenses necessary for its preservation or reasonably incurred in its sale pursuant to law ... by negotiation or transfer of this receipt, the parties agree that the amount of all advances, charges and liabilities incurred which are due or become due to the association are payable to it as sales proceeds collected on behalf of its producer patrons to be distributed to them after deduction of marketing expenses under the terms and conditions of their market-

ing agreements and the by laws of the association.

(Plainview Cooperative Compress, Inc.'s Motion ..., Ex. Unnumbered, Affidavit of D.E. Orendorf, p. 11)

### K. Gulf Compress
(Adv. No. 90–0140)

Said one bale of cotton is deliverable to bearer upon return of receipt, payment of liens and charges accrued or accruing under published tariff issued by this corporation and providing suitable transportation at warehouse loading dock ... Undersigned warehousemen (sic) claims lien on said cotton for charges and liabilities as per schedule set out in said tariff.

(Gulf Compress' Motion ..., Ex. Unnumbered, Affidavit of D.E. Orendorf, p. 10)

### L. Farmers Cooperative Compress
(Adv. No. 90–0141)

The one bale of cotton described herein to be delivered to bearer upon return of this receipt and payment as proceeds of the original depositor's sale of the amount of all advances, charges and liabilities incurred which are due the undersigned association as warehousemen ... the association, ... claims a lien on the cotton represented hereby against the holder of this receipt for sales proceeds in the amount of all advances made and liabilities incurred and all lawful charges for storage, compression, ... or other charges present or future in relation to the cotton at the rate of the association's tariff and for expenses necessary for its preservation or reasonably incurred in its sale pursuant to law ... by negotiation or transfer of this receipt, the parties agree that the amount of all advances, charges and liabilities incurred which are due or become due to the association are payable to it as sales proceeds collected on behalf of its producer patrons to be distributed to them after the deduction of marketing expenses under the terms and conditions of their marketing agreements and the by laws of the association.

(Farmers Cooperative Compress' Motion ..., Ex. Unnumbered, Affidavit of D.E. Orendorf, pp. 11–12)

*M. Taylor Compress*
(Adv. No. 90–0142)

... the undersigned warehousemen (sic) is not the owner of the cotton covered by this receipt, except as otherwise stated herein. Upon the surrender of this receipt to the above-named warehouse and the payment of all service charges, said cotton will be deliverable to the bearer ... [Further], the warehousemen (sic) claims a lien for services as follows: and any other charges for services requested in accordance to the tariff in effect on the date such service was performed.

(Taylor Compress' ... Motion ..., Ex. Unnumbered, Affidavit of D.E. Orendorf, p. 10)

*N. Levelland Compress Company, Inc.*
(Adv. No. 90–0144)

The cotton covered by this receipt will be delivered to the Depositor or to his order or to bearer, upon return of this receipt and payment of all storage and service charges accruing under Tariffs issued by this Company and on file in this office ... Any prior liens are unknown to the undersigned. A lien is reserved for all storage and service charges accruing under Tariffs of this Company and for all other lawful charges, ... Accrued charges payable July 31st.

(Affidavit Number One of Mike McDonald, Ex. B)

*O. The Trinity Company and West Texas Industries, Inc.*
(Adv. No. 90–0145)

... This warehouse receipt is issued subject to the printed tariff of the Company together with the rules attached to such tariff, a copy of which is posted in the office of said warehouseman. The rates in said tariff are made a part of this contract and the undersigned warehouseman claims a lien on said cotton for charges and liabilities as per schedule set out in said tariff ...

Upon return of this receipt and payment of all charges and liabilities due the undersigned warehouseman as maybe accrued at time of presentation, said One Bale of Cotton will be delivered to the above named depositor or his order, or bearer.

(Affidavit of William J. Landers, Ex's. A–31 and A–33)

*P. Postex Warehouse*
(Adv. No. 90–0250)

... This warehouse receipt is issued subject to the printed tariff of the Company together with the rules attached to such tariff, a copy of which is posted in the office of said warehouseman. The rates in said tariff are made a part of this contract and the undersigned warehouseman claims a lien on said cotton for all charges and liabilities as per schedule set out in said tariff ... Upon return of this receipt and payment of all charges and liabilities due the undersigned Warehouseman as may be accrued at time of presentation, said One Bale of Cotton will be delivered to the above named depositor, or his order, or bearer.

(Affidavit of William J. Landers, Ex. A–19)

It is clear that each of the receipts states that a lien is claimed for "all charges." In addition, each declares that upon payment of all charges, the cotton represented by the receipts will be delivered to bearer, and several receipts state that a lien is claimed in accordance with the warehouse's respective tariff. However, at no place in the receipts is reference made to charges "in relation to other goods." Consequently, the receipts do not comply with the exact, plain language of UCC § 7–209. Obviously, it would have been simple for the warehousemen to track the statutory language, thereby precluding this type of litigation. See, e.g., *Western Cotton Services Corp. v. Jack F. Marlow, Trustee, et al (In re The Julien Company)*, supra.

Although the receipts do not echo the exact language of § 7–209, the plaintiffs contend that their inclusions of the word "all" to describe the charges for which liens are claimed and their references to the tariffs are sufficient to establish general liens if § 7–209 is construed and applied in conjunction with UCC §§ 1–102, 7–103 and the Official Comment to § 7–209. At a minimum, according to the plaintiffs, consideration of these sections, in conjunction

with § 7–209, raises a question of fact as to whether "all charges" encompass charges incurred with respect to previously shipped cotton.

UCC § 1–102 recites the purposes, rules of construction, and availability of variation by agreement of the effect of the provisions of the UCC. It provides, in relevant part, as follows:

(1) Chapters 1 through 9 of this title shall be liberally construed and applied to promote its underlying purposes and policies.

(2) Underlying purposes and policies of chapters 1 through 9 of this title are:

(a) to simplify, clarify and modernize the law governing commercial transactions;

(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

(c) to make uniform the law among the various jurisdictions.

(3) The effect of provisions of chapters 1 through 9 of this title may be varied by agreement, except as otherwise provided in chapters 1 through 9 of this title and except that the obligations of good faith, diligence, reasonableness and care prescribed by chapters 1 through 9 of this title may not be disclaimed by agreement but the parties may be agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

(4) The presence in certain provisions of chapters 1 through 9 of this title of the words "unless otherwise agreed" or words of similar import does not imply that the effect of other provisions may not be varied by agreement under subsection (3) ...

Section 7–103 provides that: "[t]o the extent that any treaty or statute of the United States, regulatory statute of this state or tariff, classification or regulation filed or issued pursuant thereto is applicable, the provisions of this chapter [Article 7 of the UCC] are subject thereto."

As will be discussed below, the Official Comment to § 7–209 describes the effect of the language of the section.

According to the plaintiffs, consideration of these other sections is necessary for an appropriate construction of § 7–209 because they reflect the drafters' intention that § 7–209 is to be construed liberally, that it may be subject to variation by agreement, and that it is "subject to" the tariffs issued by the warehousemen in this case. Thus, it is the plaintiffs' contention that in light of § 1–102, the plain language of § 7–209 may be construed liberally and the warehouse receipts' reference to "all charges" is sufficient, given a liberal interpretation, for preservation of a general lien. Further, the plaintiffs contend that by agreement with the debtor and L & S Cotton Systems, Inc. the parties varied the strict requirements of § 7–209 in that the parties intended the claim of liens for "all charges" to establish general liens. This intention is further reflected by the reference to and language of the tariffs, according to the plaintiffs. Moreover, pursuant to § 7–103, § 7–209 is "subject to" the language of the tariffs.

Finally, the plaintiffs contend that notwithstanding the absence of any reference to charges incurred in "relation to other goods," under the first sentence of UCC § 2–709, a specific lien arises without notation on the receipt. Thus, the plaintiffs argue that *any* reference to a lien on the receipt is sufficient to establish a general lien. The plaintiffs rely on the language of the statute and the Official Comment thereto as support for this contention.

It is well settled that in effecting statutory construction and application, the specific takes precedent over the general. *In re Idalski*, 123 B.R. at 224, citing *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). The language of § 7–209 is clearly more specific than that of § 1–102. Moreover, § 7–209 provides for the creation of a statutory general lien, a legal creation in derogation of common law which, consequently, requires strict compliance with the elements necessary for its creation. *Hebert Abstract Co., Inc. v.*

*Touchstone Properties, Ltd.,* 914 F.2d 74 (5th Cir.1990); *In re Claussen,* 118 B.R. 1009 (Bankr.D.S.D.1990); *In re Bunker Exploration Co.,* 48 B.R. 708 (Bankr. W.D.Okla.1985). Therefore, notwithstanding the more general liberal construction direction of § 1–102 and its allowance for variation by agreement, the Court is not persuaded that § 7–209 may be construed other than in strict accordance with its terms with respect to the reservation of a general lien which is enforceable against third parties.

Neither is the Court persuaded that § 7–103 provides for the allowance of a general lien by references to tariffs on the face of the warehouse receipts. Section 7–209 unequivocally requires that charges for services "in relation to other goods" must be noted on the face of the receipt itself while § 7–103 provides that to the extent any tariff is applicable, the provisions of Article 7 are subject thereto. The Court has not been given nor found any authority which supports the conclusion that the elements necessary for creation of a general lien are governed by tariffs. Rather, those elements are spelled out in § 7–209. Thus, the Court can only conclude that the tariffs issued by these plaintiff-warehousemen are not applicable to this particular provision of Article 7. Accordingly, insofar as § 7–209 establishes general lien reservation requirements, it is not controlled by the tariffs.

This of course raises the issue of whether any reference to a lien on the receipt is sufficient to establish a general lien. Examination of the statutory language reveals that indeed no particular notation for the assertion of a specific lien is required, i.e., "a warehousemen has a lien against the bailor on the goods covered by a warehouse receipt." UCC § 7–209. However, as discussed above, with respect to a general lien, the statute declares:

> *If ... it is stated in the receipt that a lien is claimed for charges and expenses in relation to other goods,* the warehouseman also has a lien against [the depositor] for such charges and expenses whether or not the goods have been delivered ...

UCC § 2–709 (emphasis added).

As also discussed above, given the clear and unambiguous language of the statute, reference to the Official Comment or any legislative history would not ordinarily be necessary for construction of the statute. Assuming, as the plaintiffs argue, however, that the Official Comment may aid in the construction of the statute's terms, it bears consideration. The Comment provides the following:

> (1) Subsection (1) defines the warehouseman's statutory lien. A specific lien attaches automatically, without express notation on the receipt, to goods stored under a nonnegotiable receipt. *That lien is limited to the usual charges arising out of a storage transaction; by notation on the receipt it can be made a general lien extending to like charges in relation to other goods.* The same rules apply where the receipt is negotiable, ...

This language supports the validity of a warehouseman's lien and describes its effect. However, it does not, as does the statute, describe the particulars necessary for the establishment of an enforceable, general lien. The Court interprets the Comment's "by notation" instruction to refer to a notation which complies with the particulars of the statute. The statute, not the Comment, is the law enacted by the legislature. Thus, while the Comment may be helpful in determining the meaning and effect of a statute, it does not change the statute's text which must be enforced as plainly written. *See, In re Sinclair,* 870 F.2d 1340 (7th Cir.1989).

From these findings and conclusions, the Court concludes that there are no genuine issues of material fact that the elements necessary for a general lien, pursuant to UCC § 7–209, and enforceable against third parties, are lacking here. Thus, the institutional lenders and Trustee are entitled to summary judgment on this issue of whether the language on the receipts adequately reserves a general lien in accordance with UCC § 7–209.

## SETOFF

As noted above, setoff in the bankruptcy context is governed by statute. In pertinent part, that statute provides:

> (a) Except as otherwise provided in this section and in sections 362 and 363 of this title, [Title 11 of the United States Code], this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, ...

11 U.S.C. § 553(a).

■ From this language, it is clear that setoff by a creditor requires the existence of mutual prepetition debts between the debtor and the creditor exercising setoff. It is further clear that, under such circumstances, with exceptions not applicable here, the right to setoff is preserved. In effect, where there are mutual prepetition debts, the creditor is entitled to retain any amounts the creditor may owe the debtor to the extent of the debtor's obligation to that creditor.

If the debts are mutual for purposes of setoff, "they must subsist or be owing between the same parties, in the same right or capacity, and must be of the same kind or quality." *In re Braniff Airways, Inc.,* 42 B.R. 443, 449 (Bankr.N.D.Tex. 1984). Consequently,

> ... as a general rule, neither a creditor nor a debtor may offset prepetition debts and claims against postpetition debts and claims because of the absence of mutuality of the parties. A *debtor's* prepetition claim against a creditor does not involve the same parties as the *debtor-in-possession's* [or trustee's] claim against the same creditor.

*Id.* (emphasis in original).

It is uncontroverted, for purposes of these summary judgment motions, that the debtor was indebted prepetition to these plaintiffs. It is equally uncontroverted, for purposes of these motions, that the value of the proceeds remaining from the sale of the debtor's cotton exceeds the amount of the plaintiffs' claims in each proceeding. The issue is whether the plaintiffs were indebted to the debtor prepetition and, if not, whether the Court may allow setoff as a matter of equity to prevent irremedial injustice to the plaintiffs.

The plaintiffs contend that by virtue of their storage of the debtor's cotton which was, under state law, subject to sale for satisfaction of their storage and handling charges after which the plaintiffs would have been obligated to remit any excess proceeds to the debtor, they were indebted to the debtor. *See* U.C.C. § 7–210. In addition, the plaintiffs assert that but for the February 15, 1990, order allowing the Trustee to liquidate the cotton, they would have filed motions to lift the stay in order to liquidate the cotton themselves. They would have then been obligated to remit the proceeds to the estate, i.e., they would have been indebted to the post-bankruptcy debtor, and entitled to offset their claims. Finally, the plaintiffs assert that the cotton at issue here was deposited prepetition under such circumstances that the deposit would result in a debt, as if for sale or collection. The plaintiffs primarily rely upon *Half Moon Fruit & Produce Company v. Floyd,* 60 F.2d 799 (9th Cir.1932) and *Gibson v. Central National Bank of McKinney,* 171 F.2d 398 (5th Cir.1948) in support of their positions.

The *Half Moon Fruit & Produce Company* case involved the bankruptcy trustee's objection to the allowance of a claim filed by Half Moon Fruit & Produce Company ("company") against the estate until the company relinquished funds it received from the sale of seventy-five cars of melons belonging to the debtor and consigned to the company for sale. The trustee alleged that the receipt of the funds by the company was a preference. Pertinent to this proceeding, that Court concluded that the company could retain the funds realized from the sale of the melons, because upon the consignment of the melons by the debtor to the company, the company "owed the [debtor] the duty of converting the melons into money for the account of the [debtor]." Thus, that obligation of the compa-

ny, as consignee, was held to be a credit in the debtor's favor to be offset against the credit of the company, as consignee, for moneys previously advanced. 60 F.2d at 802.

The *Gibson v. Central National Bank of McKinney* case involved an attempt by a bankruptcy trustee to recover funds retained by the bank after it sold collateral pledged before the bankruptcy. As set forth by the Court of Appeals for the Fifth Circuit, the facts demonstrated that in December, 1944, the debtor owed the bank $10,738.26 secured by a deposit of $2,016.41 and warehouse receipts covering ten thousand bushels of corn. On December 24, 1944, the bank mistakenly honored a check drawn on the debtor's account in the amount of $1,992.63. In January of 1945, a state court appointed a receiver, who allowed the bank to sell the ten thousand bushels of corn. The net proceeds of the sale totalled $11,766.66 which, when coupled with the debtor's deposit, resulted in credits for the debtor of $13,783.07. Including the amount of the erroneously paid insufficient funds check, the debtor owed the bank $14,747.30. The trustee contended that the bank should not have been allowed to offset the amount paid on the insufficient check or the expenses of the sale. The Court found no merit in the trustee's argument that the bank's retention of these amounts constituted a preference and allowed the bank to offset the entire amount in reliance on the former Bankruptcy Act's section allowing setoffs of "mutual debts or credits." Bankruptcy Act of 1898, § 68 (11 U.S.C. § 108), reprinted in Collier on Bankruptcy, 1 Appx. 92 (15th ed.).

According to the plaintiffs' arguments in this proceeding, the *Half Moon Fruit & Produce Company* holding is significant in that the debtor's deposit of the melons resulted in a "credit in the debtor's favor" or a debt from the company to the debtor. However, the circumstances of the deposit in that case, i.e., that upon receipt of the melons, the company was obligated to convert the melons into money for the debtor's account, are distinguishable from the circumstances here. There is no evidence before this Court that the plaintiffs here owed the debtor a duty to convert the cotton into money. Rather, the evidence reflects that the plaintiffs were to store and preserve the cotton as deposited until requested to ship it to an ultimate buyer by the debtor's representatives. Consequently, the Court concludes that the *Half Moon Fruit & Produce Company* case is not authority for resolution of the issue at bar.

With respect to the *Gibson* case, the plaintiffs contend that it is significant in that the Bank was allowed to offset "indebtedness against the collateral *in addition* to the debt for which the collateral was pledged as security" *after* the sale of the collateral. 171 F.2d at 400 (emphasis added). Thus, the argument goes, this case supports the plaintiffs' assertion that they are entitled to setoff, against the sales proceeds of the cotton, amounts in excess of the bale specific charges due them.

Unfortunately, the *Gibson* opinion to which this Court is referred, located at 171 F.2d 398, offers no information concerning when any of the events described occurred in relation to the bankruptcy filing. No petition date is provided.[7] However, the *Gibson* Court allowed the setoff on the authority of the former Bankruptcy Act's provision allowing setoff. That section provided in pertinent part:

§ 68. *Setoffs and Counterclaims.*

a. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be setoff against the other, and the balance only shall be allowed or paid.

b. A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate and allowable ...; or (2) was purchased by or transferred to him after the filing of the petition or

---

7. The institutional lenders state that they examined the appellate record in *Gibson* finding that the bank realized on its security interest prepeti-tion. Institutional Lenders' Joint Response ..., p. 40, n. 28 (8/19/91).

within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent or had committed an act of bankruptcy.

Bankruptcy Act of 1898, § 68 (11 U.S.C. § 108), reprinted in Collier On Bankruptcy, 1 Appx. 92 (15th ed.).

Although lacking a specified prepetition requirement as found in current 11 U.S.C. § 553, this former section did require a finding of mutuality. According to pertinent case law, this mutuality requirement included a requirement that the obligations accrue prepetition. *See, e.g., Prudential Insurance Co. of America v. Nelson,* 101 F.2d 441 (6th Cir.1939); *McDaniel National Bank v. Bridwell,* 74 F.2d 331 (8th Cir. 1934). Therefore, assuming the Court of Appeals for the Fifth Circuit adhered to this interpretation of the mutuality requirement, it may be concluded that the obligations of the parties in the *Gibson* case accrued prepetition. If not, the case is clearly not applicable here as the controlling statute in these proceedings requires mutuality of obligations *prepetition*. Either way, the case does little to bolster the plaintiffs' argument that they are entitled to setoff their claims against the cotton proceeds unless a prepetition indebtedness to the debtor can be shown.

Rather than a consignee as the claimant in the *Half Moon Fruit & Produce Company* case or a secured creditor as the bank in the *Gibson* case, the plaintiffs here are warehousemen. By definition under state law, which is not preempted by any conflicting federal law, a "warehouseman is a person engaged in the business of storing goods for hire." UCC § 7–102(1)(h). Moreover, when "by a warehouse receipt, bill of lading, or other document of title" a warehouseman "acknowledges possession of goods and contracts to deliver them," that warehouseman meets the definition of a bailee. UCC § 7–102(1)(a).

It is well settled that a bailee of property is distinguishable from a debtor. The rationale is that the property, which is the subject of the bailment, is owned by the bailor. *Matter of Bevill, Bresler & Schulman Asset Mgmt.,* 896 F.2d 54, 57 (3rd Cir.1990). Thus, the elements of a bailment are described as:

... delivery of personal property by one person to another in trust for a specific purpose and acceptance of such delivery, and an express or implied contract that the trust will be carried out and *the property* returned to the bailor or dealt with as he directs.

*Braniff Airways, Inc. v. Exxon Co., U.S.A.,* 814 F.2d 1030, 1038 (5th Cir.1987) (emphasis added).

■ In the instant proceedings, the plaintiffs do not dispute that they acknowledged possession of the cotton by issuance of warehouse receipts. Nor do they dispute that they contracted with the debtor to at least ship, if not deliver, the cotton upon request of the debtor. It may thus be concluded that the plaintiffs here qualify as prepetition bailees, rather than debtors. Regardless of what the plaintiffs would or could have done but for the bankruptcy petition, the fact remains that they owed no mutual prepetition debt to the debtor. As such, it may further be concluded that the plaintiffs are not entitled to setoff their claims pursuant to § 553.

■ This legal conclusion, of course, leaves the issue of whether the plaintiffs may be allowed to setoff their claims under principles of equity. The remedy of setoff is one rooted in equity, thus, it has been held that the "allowance of setoff lies within the sound discretion of the trial court." *In re Braniff Airways, Inc.,* 42 B.R. at 448 (citations omitted). However, the court's discretion is not without limits. Generally, a court should deny setoff where the requirements of mutuality of parties and claims is missing. *Id.* A court of equity could permit setoff even though mutuality is lacking. It should decline to do so, however, "absent a showing of irremedial injustice." *Id.* This is because equity follows the law and "will not ordinarily allow a setoff of debts accruing in different rights or dissimilar capacities." *Id.* at 449.

According to the plaintiffs, "[t]here is no question that 'irremedial injustice' would

780

occur in these adversary proceedings if the warehousemen were not allowed their rightful setoff and that the lenders would be unjustly enriched as a result of their own actions." Response of Certain Warehousemen ..., p. 43. Further, according to the plaintiffs, the equities in these proceedings favor them as opposed to the institutional lenders because the lenders had control and knowledge of the debtor's finances. In support of this allegation, the plaintiffs direct the Court's attention to the relationship between the institutional lenders and L & S Cotton Systems, Inc. ("L & S") and its role in prepetition transactions between the plaintiffs and the debtor. This relationship and role may be briefly described as follows: In its capacity as financier of the debtor's operations, one of the lenders here, Bankers Trust Company ("BTCo") entered into a "Cotton Collateral Sub–Depository Agreement" with L & S on April 4, 1988. Pursuant to this agreement, to which the debtor consented, L & S was named as BTCo's agent to serve as the sub-depository and custodian of cotton documents deposited by the debtor for the account of BTCo. Response of Certain Warehousemen ..., Ex. A to Ex. T, Affidavit of William Wirt Ludwick; see, In re The Julien Company, 127 B.R. 604, 612 (Bankr.W.D.Tenn.1991).

In its position as sub-depository and custodian, L & S held the debtor's warehouse receipts and cotton equities which served as collateral for BTCo. Id. One of its responsibilities was to instruct warehouses in the shipment of cotton owned by the debtor and pledged to BTCo. Response of Certain Warehousemen ..., Ex. T, Affidavit of William Wirt Ludwick, ¶ 2. Upon request of the debtor for shipment of cotton, L & S would mail the negotiable warehouse receipts representing the cotton and an "instructional, transmittal" letter to the designated warehouse setting forth the specifics of the shipment requested. Id.

L & S was controlled by BTCo rather than by the debtor. In re The Julien Company, 127 B.R. at 612. On December 7, 1989, L & S received a fax from BTCo "instructing L & S to recover all warehouse receipts out in trust and not to re-

lease any until further notice." Affidavit of William Wirt Ludwick, ¶ 4.

According to the plaintiffs, upon receipt of a "transmittal letter" from L & S, they would prepare and ship the cotton designated. Response of Certain Warehousemen ..., Ex.'s A through Q, Affidavits of Warehousemen. They would then submit invoices for the payment of their charges to the debtor. Response of Certain Warehousemen ..., Ex. S, Affidavit of Donna Elzie, ¶ 2. The debtor would then remit payment for the charges from a special account established for that purpose, i.e., the DXP account, with BTCo. BTCo funded the account on a daily basis. Id. BTCo was apprised regularly of the status of the account and its collateral documents. Id; see also, Affidavit of William Wirt Ludwick, Ex. T.

Given this arrangement, the plaintiffs assert that BTCo was aware of the debtor's financial situation at all pertinent times and was, most importantly, aware of their outstanding, accrued charges at the time BTCo and other creditors placed the debtor in involuntary bankruptcy. Accordingly, inasmuch as the charges were incurred for preservation of BTCo's claimed collateral, BTCo and the other institutional lenders will be unjustly enriched at the expense of these plaintiffs if these plaintiffs are not allowed to equitably setoff their claims against the cotton proceeds. The institutional lenders contend that to allow an equitable setoff under the circumstances here would effectively circumvent the requirements for setoff in the bankruptcy context as contained in § 553. Accordingly to the institutional lenders, the plaintiffs' expectation of payment and subsequent nonpayment simply renders them unsecured creditors, but does not entitle them to setoff in contravention of the statute.

While there may be some merit to the plaintiffs' argument that the equities of this case are in their favor given the above discussion, it must be remembered that the remedy of setoff in this context is statutorily defined. As discussed above, although "irremedial injustice" may allow exceptions to the statutory requirements, the Court

has not found nor been provided any examples of "irremedial injustice" justifying such exceptions. To the contrary, the cases examined reflect a reluctance by the courts considering the issue to find "irremedial injustice" when the disallowance of equitable setoff results in a creditor holding an unsecured claim. *See, e.g., In re NWFX, Inc.,* 864 F.2d 593 (8th Cir.1989); *Boston & Maine Corp. v. Chicago Pacific Corp.,* 785 F.2d 562 (7th Cir.1986); *In re B & L Oil Co.,* 782 F.2d 155 (10th Cir.1986).

Moreover, the equity powers of this Court are generally limited by the parameters of the Bankruptcy Code as reflected by the Supreme Court's admonition

> that whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.

*Norwest Bank of Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1988). Given these precedents and the existence of statutorily defined parameters for exercising setoff, the Court concludes that, as a matter of law, it cannot extend those parameters to allow equitable setoff in these proceedings. Consequently, the institutional lenders and Trustee are entitled to summary judgment on the issues of whether the plaintiffs are entitled to legal or equitable setoff of their claims.

## RECOUPMENT

In addition to setoff, the plaintiffs urge that they are entitled to recover their charges by recoupment. Like setoff, the doctrine of recoupment is important in the bankruptcy context for, where applicable, it may be used to afford a creditor preferential treatment. *In re NWFX, Inc.,* 864 F.2d at 597.

> Both setoffs and recoupment are counterclaims, but they differ in that the setoff is a claim that arises out of a transaction different from the one sued on. It is asserted to diminish a plaintiff's demand. *Frederick v. U.S.,* 386 F.2d 481 (5th Cir. 1967) ... Recoupment, which is a defense as well as a counterclaim, on the other hand, is a counter demand arising from the same transaction as the plain-

tiff's claim. *Lee v. Schweiker,* 739 F.2d 870, 875 (3rd Cir.1984).

*In re Buttes Resources Co.,* 89 B.R. 613, 615 (S.D.Tex.1988); *see also In re Holford,* 896 F.2d 176, 178 (5th Cir.1990); *In re B & L Oil Co.,* 782 F.2d 155, 157 (10th Cir.1986). In addition, recoupment is most commonly, though not always, allowed where the parties were operating under a contract which specifically allowed recoupment. *In re NWFX, Inc.,* 864 F.2d at 597; *cf. In re Holford,* 896 F.2d 176 (5th Cir.1990).

As discussed above, the Court has found that no prepetition mutual obligations existed between the plaintiffs and the debtor. Assuming arguendo, however, that the plaintiffs did owe an obligation, i.e., the potential proceeds from the cotton in storage, to the debtor, there is no evidence that such an obligation would have arisen out of the same transaction as the debtor's obligation to the plaintiffs, i.e., payment for services in connection with the previously shipped cotton. The debtor's obligation to pay for services performed with regard to previously shipped cotton would seemingly have arisen out of the transactions involving that cotton rather than out of the transactions involving the cotton in storage at commencement of the case. Having no evidence of mutual claims arising out of the same transaction, the Court concludes that the plaintiffs' motion for summary judgment under the recoupment doctrine must be denied, and the institutional lenders and Trustee are entitled to summary judgment on this issue.

## EQUITABLE COLOR OF LIEN

Finally, the plaintiffs contend that they are entitled to recover their charges for services performed with respect to all of the debtor's cotton from the proceeds on hand on the basis that the cotton they held at the commencement of the case was subject to an equitable color of lien. From a review of the plaintiffs' memorandums and caselaw cited therein, it is the Court's understanding that an equitable color of lien is essentially a lien, enforceable in equity, which arises by virtue of the parties'

express or implied agreement and custom and course of dealing with one another. It is a remedy imposed to avoid enrichment. *See, e.g., Citizens Co–Op Gin v. United States*, 427 F.2d 692 (5th Cir.1970); *In re McConnell*, 122 B.R. 41, 45 (Bankr. S.D.Tex.1989). Consistent with the Court's understanding is the plaintiffs' argument here that they essentially had agreements with the debtor and L & S, as illustrated by their custom and course of dealing, that they would ship cotton at the direction of L & S, submit invoices for accrued charges to the debtor and receive payment from the debtor's DXP account, which was monitored and funded by BTCo. All parties were aware that if not paid, the warehousemen would refuse to ship further cotton. *See* above discussion under "Setoff." In support of this argument the plaintiffs have submitted, *inter alia*, affidavits of the warehousemen involved in these proceedings; of Donna Elzie, a former employee of the debtor; of William Wirt Ludwick, former president of L & S; of D.E. Orendorf, a former employee of and consultant to the debtor; and of Julien J. Hohenberg, former president of the debtor.

The institutional lenders have responded to these arguments and affidavits, contending that the allowance of such equitable liens would effectively annihilate the above discussed statutes and precedent applicable to these proceedings, which govern the establishment of general liens.

▮ The Court recognizes that the arguments posed by the plaintiffs in support of an equitable lien remedy are dangerously similar to, if not exactly like, the arguments presented in support of interpreting the warehouse receipts so as to reflect general liens and of finding an equitable right of setoff. Accordingly, at first glance, these arguments seem untenable and yet another attempt to circumvent the UCC and Bankruptcy Code by giving effect to "secret liens." However, upon closer examination, it appears that this equitable lien argument may, in this case, have merit at least as to BTCo because there is some

evidence indicating that the liens may not have been a secret unknown to BTCo or its agent L & S.

It is undisputed that the plaintiffs and the debtor, via its former president, had an agreement whereby the plaintiffs would ship cotton when requested to do so by L & S and would later submit invoices for payment of their service charges. It was further understood between the parties that the plaintiffs would refuse to ship additional cotton if not paid for their prior services. Response of Certain Warehousemen ..., Exs. A–Q, Affidavit of Warehousemen; Ex. S; Affidavit of Donna Elzie; Supplemental Memorandum In Support of Warehousemen's Motion; Ex. 1, Affidavit of Julien J. Hohenberg. In stating its prior conclusions under the plaintiffs' other theories of recovery, the Court intends to make it clear that the asserted liens are unenforceable under the applicable law as to innocent third parties, such as the Trustee. However, the relationship between L & S, BTCo and the debtor, and the asserted relationship between L & S and the plaintiffs suggest that BTCo may not qualify under these unique circumstances as an innocent third party.

Indeed, the affidavits submitted by the plaintiffs and referenced above indicate that BTCo, through its agent L & S, was intrinsically involved in the debtor's transactions with these plaintiffs. See above discussion under "Setoff." Moreover, the record reflects that the proceeds derived from the sale of the debtor's cotton have been provisionally paid to BTCo. As such, unlike the usual bankruptcy case where general liens are disfavored as preferential and assets are collected and preserved for the benefit of the estate and all its creditors, the evidence here suggests that the assets have been collected and preserved for the asserted claims of BTCo.

Therefore, the issue becomes whether L & S and/or BTCo [8] knew of and participated in the agreement between the debtor

8. It is well settled that the knowledge of an agent may be imputed to its principal. *See, e.g.,*

*Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241, 245–46 (5th Cir.1983).

and the plaintiffs that the warehousemen would reserve a lien on cotton for the payment of prior invoices by retention of the cotton. The evidence submitted by the plaintiffs strongly suggests that BTCo was aware of the arrangement whereby the plaintiffs would submit invoices subsequent to shipping cotton at the direction of L & S. However, the evidence is not so skewed with regard to whether BTCo had knowledge of the lien agreement. Although Donna Elzie states in her affidavit that Mr. Andrew Halle, a representative of BTCo, had knowledge of this arrangement, no mention of such knowledge is made in the affidavit of Mr. Ludwick, the president of L & S, nor by any other affiant involved in these transactions. Moreover, discovery was stayed in this matter following the filing of the institutional lenders' motion for partial summary judgment, thus precluding the lenders from investigating the facts pertinent to this issue of an equitable lien, and they have specifically reserved their right to do so. See Post Hearing Memorandum ... of Institutional Lenders. Consequently, in all fairness, the Court can not conclude that the plaintiffs are entitled to summary judgment on this issue at this stage of the proceedings.

It should be noted that should the Court ultimately rule in the plaintiffs' favor, with a finding that they are entitled to assert equitable liens enforceable against the institutional lenders, such liens would not be enforceable against the Trustee who, of course, possesses a distinct third party status and avoidance powers.

From the above discussion the Court concludes that there remain outstanding issues of material fact pertinent to this issue and the parties' cross motions for summary judgment must be denied on the issue of equitable color of lien. Accordingly, any disputed issues regarding the amounts of the warehousemen's claims likewise remain unresolved.

IT IS THEREFORE ORDERED that the motions for partial summary judgment filed by the institutional lenders and adopted by the Trustee in each adversary proceeding are granted on the following issues:

(1) The plaintiffs' warehouse receipts do not reflect properly reserved general liens in accordance with applicable law;

(2) The plaintiffs are not entitled to legal setoff of the amounts due them;

(3) The plaintiffs are not entitled to equitable setoff of the amounts due them; and

(4) The plaintiffs are not entitled to recoupment of the sums due them for all charges related to the debtor's cotton.

IT IS FURTHER ORDERED that the cross motions for partial summary judgment filed by the plaintiffs, the institutional lenders and the Trustee in each adversary proceeding are denied on the following issue:

(1) Whether the plaintiffs are entitled to recover from the institutional lenders under an equitable "color of lien" theory.

A further pre-trial and scheduling conference will be held on Thursday, the 26th day of March, 1992 in Courtroom 680, 200 Jefferson Avenue, Memphis, Tennessee at 9:30 a.m. to discuss discovery and trial of the plaintiffs' "color of lien" theory. The Court will also consider at that conference whether the "color of lien" theory is a core proceeding.

SO ORDERED.