409 So.2d 496 (1982)
JIMANI CORPORATION, Wayne Truitt, and Phillis Truitt, Appellants,
v.
S.L.T. WAREHOUSE COMPANY, Metro Bank of Dallas, Laquinta Motor Inns, Inc., and Paul H. Morgan, Jr., Appellees.
No. SS-471.
District Court of Appeal of Florida, First District.
January 5, 1982.
Rehearing Denied February 11, 1982.
*497 L. Ralph Smith, Jr. and Thomas J. Maida, of Peeples, Earl, Smith, Moore & Blank, Tallahassee, for appellants.
William L. Gary, of Pennington, Wilkinson, Gary & Dunlap, Tallahassee, for appellee S.L.T. Warehouse Company.
Brian S. Duffy and J. Lawrence Johnston, of Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, for appellee Metro Bank of Dallas.
Thomas J. Guilday, of Akerman, Senterfitt & Edison, Orlando, for appellee, LaQuinta Motor Inns, Inc.
James D. Beasley, of Ausley, McMullen, McGehee, Carothers & Proctor, Tallahassee, for appellee Paul H. Morgan, Jr.
BOOTH, Judge.
This cause is before us on appeal by Jimani Corporation [Jimani] and its stockholders, *498 Wayne and Phillis Truitt [Truitts], and on cross-appeals by Metro Bank of Dallas [Metro] and LaQuinta Motor Inns, Inc. [LaQuinta] from a final judgment and certain post-judgment orders which determined all issues except the counterclaim of Jimani against Metro and S.L.T. Warehouse Company [SLT], and the cross-claim of Jimani against LaQuinta, which remain to be tried by a jury.
SLT filed suit in interpleader against Jimani and Wayne Truitt to determine the right to possession of goods located in a warehouse in Tallahassee, Florida, and for enforcement of a warehouseman's lien. Metro intervened, filing a complaint to enforce its security interest in the same goods. LaQuinta and Metro were added as parties defendant by SLT. LaQuinta counterclaimed against SLT and Jimani.[1]
The property which is the subject matter of these competing claims consists of prefabricated bathroom modules weighing 4,000 pounds each and manufactured by Jimani pursuant to a contract with LaQuinta. The LaQuinta contract called for Jimani to construct 61 1/2 modules to be used in LaQuinta's motel in Tallahassee, Florida.
SLT agreed to set up a field warehouse operation in Tallahassee for Jimani. Pursuant thereto, Jimani leased a warehouse in Tallahassee as a manufacturing site for the LaQuinta modules. A portion of the warehouse was intended to be subleased to SLT for its operation as warehouseman having charge of modules as they were completed.
Metro claimed a security interest in the modules based on its extension of a $250,000 line of credit to Jimani and Jimani's assignment as collateral of "[a]ll of Debtor's accounts receivable and all contract rights ... and returned, refused and repossessed goods."
LaQuinta and Jimani agreed that Jimani would place completed modules in a bonded warehouse in Tallahassee where they could be inspected by LaQuinta and that, upon delivery to LaQuinta of a warehouse receipt and proof of insurance, LaQuinta would pay the contract price for the modules covered by the receipt. This arrangement accommodated LaQuinta because it had insufficient locations at the construction site to accept delivery of all the modules. The arrangement was also beneficial to Jimani, as it was fast approaching the maximum limit of its line of credit with Metro and could apply the payment for modules, as completed, to its outstanding balance.
On May 25, 1978, Jimani notified LaQuinta that 41 units were completed and would be shortly available to LaQuinta. Jimani made specific inquiry as to when payment would be made for these units. On June 8, 1978, LaQuinta confirmed that it would pay upon its receipt of a warehouse receipt. On June 21, 1978, SLT issued to Jimani a nonnegotiable warehouse receipt covering the 41 completed modules which, at that time, had already been inspected by LaQuinta. Invoice and warehouse receipt, mailed to LaQuinta June 28, 1978, were stamped by a LaQuinta employee as "received" July 6, 1978, but payment due was not forthcoming.
In the latter part of July, 1978, Jimani verbally notified SLT not to release the modules to LaQuinta because the agreed payment had not been made. In addition, Jimani requested cancellation of the warehouse arrangement.
SLT advised LaQuinta that the warehouse receipt was invalid because it had been issued at a time when SLT had no sublease on the warehouse premises and requested LaQuinta to return the receipt to SLT. LaQuinta then advised that it would not pay the contract price for the modules covered by the receipt. By letter dated August 7, 1978, LaQuinta told SLT that it was retaining the warehouse receipt and would look to SLT for performance under the terms of the receipt.
On November 15, 1978, Metro advised SLT that it claimed a security interest in *499 the modules and would hold SLT liable for preservation of the property, and, by telegram of November 16, 1978, stated:
Confirming various conversations Metro Bank of Dallas has foreclosed security interest and now owns all items located in SLT Warehouse in Tallahassee Florida. Will arrange to pick up material as soon as possible. Expect you to preserve material.
Thereafter, SLT filed suit in the lower court and obtained a temporary injunction to prevent removal of the modules from the warehouse.
In the final judgment sought to be reviewed, the trial court determined that there was an outstanding valid warehouse receipt enforceable in the hands of LaQuinta covering specified goods stored in a warehouse under the control of SLT and that SLT had a valid warehouseman's lien in the amount of $24,333.99. The court held that SLT's lien was superior to the claims of Metro and all other parties, and authorized SLT to sell the 41 completed bathroom modules free and clear of all liens and encumbrances, including that of Metro.
The trial court further determined that LaQuinta, as holder of the warehouse receipt issued by SLT, had the right to compel SLT to hold the 41 modules for the benefit of LaQuinta. Finally, the court held:
[E]ach of the parties described herein bear some responsibility for causing the events which led to the institution of these proceedings, including conduct which initiated or precipitated the cause of action and which prevented a timely resolution prior to commencement of this action. In this regard, the Court finds that the parties contributed to the events necessitating this litigation in the following percentages:

 Metro Bank of Dallas 15%
 LaQuinta Motor Inns, Inc. 55%
 Jimani Corporation 20%
 S.L.T. Warehouse Company 10%

Accordingly, judgment was entered in favor of SLT against the other parties in the following amounts: (a) Metro, $3,650.00; (b) LaQuinta, $13,383.69; and (c) Jimani, $4,866.80.
After entry of the final judgment, Metro applied to the court and was given the right to discharge SLT's lien by payment of $28,833.99, a figure which included charges subsequent to the judgment, and to take possession of the modules in foreclosure of its lien. Metro discharged the SLT lien and took possession of the modules in October of 1979.
On appeal, the parties have raised a number of issues which require consideration of the principles governing field warehousing, the seller's right to stop delivery, the warehouseman's lien, interpleader, attorney fees and the attorney-client privilege.

Field Warehousing
Field Warehousing is typically used by manufacturers and sellers as a means of obtaining financing from lending institutions by pledging as collateral warehouse receipts on products and goods which remain on the manufacturer's or seller's premises. In the usual arrangement, the seller contracts with a licensed warehouseman to assume control of goods and to issue a nonnegotiable warehouse receipt which can be pledged as security. It is not unusual for an employee of the seller to be loaned to, and employed by, the warehouseman to take charge of the goods.[2] Minimum *500 requirements must be met, however, so that the warehouseman has control independent of the seller and is, therefore, legally in possession of the goods.[3]
An important distinction between a typical field warehousing arrangement and the arrangement here is that the warehouse receipt was not pledged to Metro Bank as collateral on its loan to Jimani. Instead, accounts receivable arising from the sale of the goods by Jimani to LaQuinta were pledged.

Right to Stop Delivery
The first issue raised by the parties is whether Jimani had the right to cancel the warehouse arrangement in the latter part of July, 1978.
Due to the nature of a field warehouse arrangement, as previously discussed, cancellation of the field warehouse is the equivalent of a stop-delivery order. The seller's right to issue a stop-delivery order depends upon: (1) the Uniform Commercial Code [UCC] as adopted in Florida; and (2) the agreement between the parties.
Under the UCC, a negotiable warehouse receipt is a document of title which symbolizes the goods themselves, whereas a nonnegotiable receipt does not. The result of this distinction is that the warehouseman is entitled to require relinquishment of the negotiable instrument at the time he turns over possession of the goods and, indeed, must do so to protect himself from liability. In the case of a nonnegotiable receipt, the seller may require the warehouseman to stop delivery as against the buyer so long as there has not been an actual delivery of the goods or an acknowledgment or attornment by the warehouseman to the buyer.[4] This is true even when the buyer still has the nonnegotiable receipt originally issued by the warehouseman or refuses to give it up.
Florida Statutes, Sections 672.705(2)(b) and (3)(c), provide that, after issuance of a nonnegotiable warehouse receipt, a seller may stop delivery and cut off the right of a buyer to obtain possession of the goods prior to "acknowledgment to the buyer by any bailee of the goods ... that the bailee holds the goods for the buyer." This acknowledgment by the warehouseman to the holder of the receipt has traditionally been referred to as "attornment."[5] It operates to cut off the seller's right to stop delivery to the holder of a nonnegotiable receipt. Prior to attornment, the seller may stop delivery.
In the instant case, LaQuinta contends that SLT's letter of June 28, 1978, was an attornment which cut off the right of Jimani to cancel the warehouse arrangement. The trial court made no specific finding on this point; however, the letter referred to relates to the setting up of a warehouse operation and seeks a reply from LaQuinta as to whether releasing arrangements used *501 in a previous warehouse would apply.[6] No mention is made of any goods being held for the account of LaQuinta. The letter is insufficient to perfect a right of possession in LaQuinta (buyer) cutting off the seller's right to stop delivery and is not an attornment. Thus, Jimani had the right to demand cancellation of the warehouse, and SLT was required by the provisions of the UCC to relinquish control of the premises unless the agreement between the parties provided otherwise.
The agreement, entitled "Collateral Control Agreement," provides that Jimani (seller) may not terminate or cancel the warehouse arrangement if there is an outstanding warehouse receipt.[7] This provision of the agreement is not specifically relied on by SLT; however, we address the issue since it may bear on the future litigation between the parties and hold that the agreement did not preclude Jimani's cancellation of the warehouse.
The Collateral Control Agreement, executed on a standard form furnished by SLT, further requires Jimani to lease necessary premises and gives SLT the right at any time to cancel the agreement if Jimani "does not execute a lease ... upon storage space which is satisfactory and suitable to SLT and which will entitle SLT to uninterrupted and exclusive possession of the building."[8] After execution of the agreement, Jimani leased the required warehouse and obtained consent to sublease from the landlord. However, the sublease contemplated by the agreement was not executed at the time a warehouse receipt covering the 41 modules was issued. At the end of July, 1978, when Jimani sought to cancel the warehouse arrangement with SLT, the sublease still had not been executed. SLT, an expert in the area of field warehousing, knew that, in addition to its failure to obtain a lease on the premises, it failed to meet other requirements for a valid warehousing operation. Specifically, there was no separation or designation of modules covered by the warehouse receipt from modules not covered by the receipt and no setting aside or roping off of any specific area within the warehouse to be under the exclusive control of SLT.[9] These deficiencies existed even though the Collateral Control Agreement gave SLT the right to demand: a sublease; necessary setting apart of inventory; enclosures; signs; exclusive areas for SLT's use; and expenses needed for preservation and possession of goods covered by the warehouse receipt. Since the warehouse arrangement was incomplete, it was terminable at will by Jimani on payment of any outstanding warehouse charges.
At the time Jimani sought to cancel, all warehouse charges had been paid, and there were no intervening rights of third parties. The warehouseman had no right under the UCC or the agreement between the parties to refuse cancellation of the warehouse. The document issued by SLT, entitled "Nonnegotiable Warehouse Receipt," may have had that legal significance in the hands of a buyer who obtained either delivery of the goods or an attornment by the *502 warehouseman prior to the seller's cancellation order. However, as between the immediate parties to the Collateral Control Agreement, the warehouse arrangement was incomplete and legally insufficient to transfer control to SLT of the goods or to form a basis for SLT's refusal to cancel the warehouse. Since no rights of the buyer (LaQuinta) to the goods were affected by deficiencies in the warehousing arrangement, those deficiencies form no defense for the buyer's (LaQuinta) breach, if any, of the contract with the seller (Jimani).

Warehouseman's Lien
SLT has no lien for warehouse charges. Under the UCC, a warehouseman has a lien on goods in its possession for charges incurred in connection with warehousing the goods.[10] The Code provides, however, that the warehouseman's lien is lost if there is an unjustified refusal to relinquish possession of the goods.[11] The warehouseman's refusal to cancel the warehouse upon request by Jimani cannot be justified either under the Code or by the terms of the agreement between Jimani and LaQuinta, as previously pointed out. Loss of the right to claim a lien against the goods for warehouse charges does not, however, prevent SLT from making a claim for those charges.
Warehouse charges that accrued prior to the date the court determines Metro first asserted its lien on the contents of the warehouse are to be paid by SLT and LaQuinta in such proportions as the court determines. Charges that accrued after the date Metro asserted its lien are the responsibility of SLT, LaQuinta and Metro Bank in such proportions as the trial court shall order. No basis appears for assessing any portion of the warehouse charges against Jimani because, as of the date of Jimani's demand for termination of the warehouse arrangement, no charges were due from Jimani to SLT, and Jimani was entitled to terminate the warehouse at that time.

Metro Bank's Security Interest
The security agreement between Metro Bank and Jimani dated February 15, 1978, grants to Metro a security interest in the following described collateral:
All of Debtor's accounts receivable and all contract rights now existing or hereafter arising and returned, refused and repossessed goods, either now owned or in existence or hereafter acquired or accruing to Debtor. [emphasis supplied]
Pursuant to the above provision, Metro claimed a security interest in the contents of the warehouse, including both completed and incompleted modules located therein. The basis specifically for Metro's claim is that the goods in question were "refused" goods. We note that the accounts receivable which arose on completion of the modules were pledged to Metro pursuant to this provision, but the above-quoted provision does not cover "inventory." Thus, Metro's security interest extends to the accounts receivable and contract rights against LaQuinta but not to Jimani's inventory.
We hold that the description of collateral in the security agreement relied on and underscored in the above-quoted provision is insufficient to allow enforcement of Metro's lien against the modules. Florida Statutes, Section 679.203(1)(b); American Restaurant Supply Company v. Wilson, 371 So.2d 489 (Fla. 1st DCA 1979). A description of collateral is sufficient when the agreement covers all of a certain type of asset, Barnett Bank of Pensacola v. Fletcher, 290 So.2d 533 (Fla. 1st DCA 1974), or, where less than all of a type of collateral is to be encumbered, if the agreement specifies the encumbered portion or items, as stated in American Restaurant Supply, 371 So.2d at 490:
The security agreement under consideration describes the collateral as: "Food *503 service equipment and supplies delivered to San Marco Inn at St. Marks, Florida." Many courts have held that a description of collateral is sufficient when the agreement covers all of a certain type or types of assets. [citations omitted] However, the agreement before us does not cover all of the food service equipment and supplies located at San Marco Inn or owned by the debtor. The agreement attempts to cover some food service equipment and supplies, but the description does not do its assigned job of making possible the identification of the equipment and supplies in which American claims a security interest.
The foregoing rule applies to preclude enforcement of a security interest against the debtor or third parties where the security agreement description of collateral is insufficient. American Restaurant Supply, 371 So.2d at 489.
Further, we note that the goods in question were not "refused goods" at the time Metro filed suit, and LaQuinta continued to claim a right to the goods and to retain possession of the warehouse receipt, giving colorable validity to its claim and preventing Jimani from exercising rights of ownership. It appears that LaQuinta, in retaining possession of the document in question, sought to preserve its position in the on-going dispute with Jimani which extended to transactions not directly involved in this litigation and to maintain its right to claim the modules at some time when it was more feasible to pay for them or, perhaps, when they would be sold for a lower price. LaQuinta did not refuse the goods, and the bank's security interest did not attach. This is not to say, however, that the bank is unprotected. The pledge to Metro of "all accounts receivable and all contract rights" is a sufficient description and includes receivables and contract rights arising in the transaction between LaQuinta and Jimani.
Metro Bank foreclosed its lien and took possession of the entire contents of the warehouse, including the completed and incompleted modules. The record before us does not disclose facts concerning the foreclosure sale. The remedy of the debtor for improper foreclosure of lien has not been addressed in the briefs here and can best be determined in connection with the suit against Metro which remains to be tried, with appropriate amendments, if any, to pleadings for this purpose.

Interpleader and Attorney Fees
SLT filed suit in interpleader in this case seeking to determine who was entitled to the rightful possession of the modules. Had that been all that SLT sought to obtain in this litigation, SLT would have the right to claim attorney fees. However, SLT also claimed a lien against the goods in question, making it an "interested" party in the subject of the litigation, to-wit: the modules. The UCC recognizes the right of the warehouseman, who is confronted with conflicting claims for goods within its possession, to file suit in interpleader as a disinterested stakeholder to determine the proper party entitled to delivery of the goods.[12] The Code does not, however, change the basic requirements of the law of interpleader as it exists in Florida so as to allow an award of attorney fees to a party who is seeking to enforce its own claim against the interpleaded goods. SLT was not a disinterested stakeholder. Further, SLT contributed substantially to the conflict, as found by the trial court, and, on that basis as well, is not entitled to fees.[13] Accordingly, that portion of the charges denominated attorney fees should not be allowed.
*504 After subtraction of attorney fees, the remaining charges are imposed, as previously stated, on SLT, LaQuinta and Metro for the time periods indicated and amounts to be ordered by the trial court. Metro has paid all charges originally claimed by SLT, including attorney fees, and it is entitled to appropriate recovery from SLT and LaQuinta.

Attorney-Client Privilege
In a post-judgment order, the trial court determined that the attorney-client privilege precluded inquiry by Jimani into correspondence between counsel for LaQuinta and Metro Bank in connection with Jimani's allegation of conspiracy. We have reviewed the record in this regard and find no abuse of discretion on the part of the trial court in making what is essentially a factual determination and upholding the attorney-client privilege.[14]
Accordingly, the judgment and orders sought to be reviewed are affirmed in part and reversed in part and the cause remanded for entry of a judgment in accordance herewith.
SHAW, J., concurs.
ROBERT P. SMITH, Jr., C.J., dissents with written opinion.
ROBERT P. SMITH, Jr., Chief Judge, dissenting:
I would entirely affirm the trial court's judgment.
NOTES
[1] LaQuinta's counterclaim against SLT for refusing to deliver modules covered by warehouse receipt filed January 1, 1979, was dismissed, on motion of LaQuinta, August 7, 1979. LaQuinta's counterclaim against Jimani was voluntarily dismissed May 15, 1979.
[2] McGuire, "The Impact of the UCC on Field Warehousing," 6 UCC L.J. 267, 271-72 (Winter 1974); Comment, 69 Yale L.J. 663, 664 (1960), reprinted in Mentschikoff, Commercial Transactions (1970):

[a]n independent warehouse company acts as the custodian of inventory against which a businessman, usually a manufacturer, seeks to secure credit. From the warehouseman's standpoint, the operation is in the "field," although the goods do not leave the borrower's premises. The items to be "warehoused" are segregated from the rest of the borrower's stock, in an area leased for a nominal sum to the warehouse company and demarcated with signs and physical barriers. The borrower's usual clerk is employed by the warehouse company to exercise control over the goods on its behalf. As items of inventory are deposited, warehouse receipts are issued against them.
See, generally, Lawrence Warehouse Company v. McKee, 301 F.2d 4, 6 (5th Cir.1962).
[3] Whitney National Bank of New Orleans v. Sandoz, 362 F.2d 605, 607 (5th Cir.1966):

For warehouse receipts issued by a field warehouseman to have validity they must be issued by a bona fide, independent warehouseman. The borrower cannot be his own warehouseman and receipts issued by one who is a warehouseman in name only can have no validity. The portion of the borrower's property set aside as a warehouse must be under the exclusive control of the warehouseman. The warehoused goods must be in the exclusive possession of the warehouseman, with the borrower excluded as well as others. There must be adequate markings of the warehouse area and of the warehoused goods. The goods must be so stored and so described in the warehouse receipts that there can be an identification of specific goods to match particular descriptions.
[4] Carter, "Acquisition and Loss of Rights of Buyers and Sellers to Goods Under the UCC," 6 B.C.Ind. & Com.L.Rev. 169 (1964); Riegert and Braucher, Documents of Title §§ 2.4, 5.3.4 (1978). See, e.g., Southeast Foods, Inc. v. Penguin Frozen Foods, 203 So.2d 39 (Fla. 3d DCA 1967), cert. denied, 210 So.2d 226 (Fla. 1968) (warehouseman properly complied with seller's stop delivery order even without surrender of nonnegotiable receipt).
[5] See Carter, "Acquisition and Loss of Rights of Buyers and Sellers to Goods Under the UCC," 6 B.C.Ind. & Com.L.Rev. 169, 173-74 (1964).
[6] There was no response from LaQuinta to this letter.
[7] Collateral Control Agreement:

[N]o ... notice of intention to terminate given by Customer to SLT shall be effective unless all charges and expenses ... shall have been paid in full to SLT by Customer and all outstanding Warehouse Receipts ... shall have been cancelled or release order shall have been delivered to SLT from Holder for the goods and merchandise covered by all outstanding Warehouse Receipts.
[8] Collateral Control Agreement:

SLT shall not be obligated to furnish field warehouse services under the terms of this Agreement and this Agreement may be cancelled by SLT at any time at its option without prior notice if Customer [Jimani] does not execute a lease or leases upon storage space which is satisfactory and suitable to SLT and which will entitle SLT to uninterrupted and exclusive possession of the buildings, rooms and/or premises so demised.
[9] Jimani had access to all areas of the warehouse until September, 1978, when SLT changed the locks and denied Jimani all access to the warehouse and its contents, including the modules and materials not covered by the warehouse receipt.
[10] Florida Statutes, Section 677.209.
[11] Florida Statutes, Section 677.209(4), provides, in pertinent part: "A warehouseman loses his lien on any goods ... which he unjustifiably refuses to deliver."
[12] Florida Statutes, Section 677.603.
[13] Kurz v. New York Life Insurance Company, 168 So.2d 564 (Fla. 1st DCA 1964) (to be entitled to attorney fees in interpleader action, plaintiff must demonstrate total disinterest in outcome of suit other than in bringing conflicting claims to court); Ellison v. Riddle, 166 So.2d 840 (Fla. 2d DCA 1964) (to be entitled to attorney fees in interpleader action, plaintiff must demonstrate total disinterest in stake he holds and that he did nothing to cause conflicting claims). Compare, National Life Insurance Company v. Southeast First National Bank, 361 So.2d 432 (Fla. 4th DCA 1978) (totally disinterested insurers who did nothing to cause conflicting claims could recover fees in interpleader action).
[14] 81 Am.Jur.2d, Witnesses 222 and cases cited therein.