**BLUEBONNET WAREHOUSE COOPERATIVE; Federal Compress & Warehouse Company, Inc., Plaintiffs,**

**Blytheville Compress Company, Inc., et al., Plaintiffs–Appellants,**

v.

**BANKERS TRUST COMPANY, Defendant–Appellee.**

No. 94–5582.

United States Court of Appeals, Sixth Circuit.

Argued June 12, 1995.

Decided July 17, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 29, 1996.*

---

* Chief Judge Merritt would grant rehearing for the reasons stated in his dissent.

Charles J. Swayze, Jr. (briefed), James Y. Dale (argued), Whittington, Brock, Swayze & Dale, Greenwood, MS, for Plaintiffs–Appellants.

William J. Landers (argued and briefed), Lee L. Piovarcy, Scott T. Beall, Martin, Tate, Morrow & Marston, Memphis, TN, for Defendant–Appellee.

Before: MERRITT, Chief Judge; MARTIN, Circuit Judge; SIMPSON, Chief District Judge.*

MARTIN, J., delivered the opinion of the court, in which SIMPSON, D. J., joined. MERRITT, C.J. (pp. 11–23), delivered a separate dissenting opinion.

BOYCE F. MARTIN, Jr., Circuit Judge.

Blytheville Compress Co., Inc., and several other cotton warehouses appeal from a grant of summary judgment to Bankers Trust Company in their suit seeking payment of accrued storage charges for cotton. The

---

* The Honorable Charles R. Simpson, III, Chief United States District Judge for the Western District of Kentucky, sitting by designation.

warehouses are unsecured creditors of a now-bankrupt cotton merchant, the Julien Company. In their suit, they sought to enforce an express or implied contract between themselves and Bankers Trust, one of the Julien Company's secured lenders. The district court dismissed the action, finding that (1) no express or implied contract existed between the warehouses and Bankers Trust, and (2) a lender holding a perfected security interest in its borrower's negotiable warehouse receipts does not become liable for its borrower's debts when acting to maintain and protect its security interest. We agree and therefore AFFIRM.

## I.

Before discussing the particulars of this case, some background information about the cotton industry in general is helpful. After cotton is harvested, it is ginned and compressed into 500 pound bales before being stored in warehouses to await further transactions. Typically, when it is delivered, the warehouse issues a negotiable warehouse receipt for the cotton. These are issued to whoever deposits the cotton. Warehouses also publish "tariffs" containing a statement of their charges for storage and other such services. Generally, these are not sent to banks who lend to the cotton merchants. By statute, a warehouse storing cotton has a possessory lien against that cotton for its storage charges.

Cotton merchants, such as the Julien Company, acquire ownership of cotton by purchasing the negotiable warehouse receipts. The cotton merchant is then entitled to present the receipt to the warehouse and to take possession or ship the cotton upon satisfaction of the warehouse's statutory possessory lien. Most cotton merchants require bank financing in order to operate.[1] In exchange for this financing, lenders usually require that the merchant's warehouse receipts be pledged and physically delivered to them. When the lender takes physical possession of the receipts, it becomes the "collateral custodian." In some cases, the lender will designate a third-party to act as its agent, a collateral sub-custodian.

## II.

All of the states adopted the Uniform Warehouse Receipts Act shortly after it was promulgated. As with many of the uniform acts, however, by the late 1930s it was already outdated. Thus, in the 1940s, the National Conference of Commissioners on Uniform State Laws began drafting the Uniform Commercial Code to replace those laws enacted decades earlier. In doing so, over 1500 attorneys spent more than fifteen years piecing the U.C.C. together. No other piece of legislation or code provision ever received such scrutiny and consideration. Adopted by forty-nine states within ten years of disseminating its first draft,[2] the U.C.C. has been hailed as "the most spectacular success story in the history of American law." WHITE AND SUMMERS, UNIFORM COMMERCIAL CODE § 1 (Vol. 1 at 5) (3d ed.1988). Unfortunately, in practice, Article Seven of the Code, dealing with documents of title and warehouse receipts specifically, was not successfully followed in this case.

Under the Uniform Commercial Code, a warehouse has a possessory lien against the goods covered by a warehouse receipt for storage charges. U.C.C. § 7–209(1). Against a person to whom a negotiable warehouse receipt is duly negotiated, the warehouseman's lien is limited to reasonable storage charges where none are specified on the receipt. Id. The Code provides that a person claiming cotton covered by a warehouse receipt must satisfy the warehouseman's lien when the warehouse so requests. U.C.C. § 7–403(2). Further, both the Code

---

1. "In some situations, up to 90% of the cost of the raw cotton may be financed by borrowing against futures contracts and warehouse receipts as collateral...." *Allenberg Cotton Co., Inc. v. Pittman,* 419 U.S. 20, 27 n. 11, 95 S.Ct. 260, 264 n. 11, 42 L.Ed.2d 195 (1974).

2. The Uniform Commercial Code is law in each of the five states where the warehouses involved are located. Ark.Code Ann. § 4–7–209; La.Rev. Stat. Ann. § 10:7–209; Miss.Code Ann. § 75–7–209; Tenn.Code Ann. § 47–7–209; Tex. Bus. & Com.Code Ann. § 7.209. For that reason, reference in this opinion will be to the U.C.C., rather than to each state's statute.

and federal Warehouse Act provide that a warehouse is not required to release a bail of cotton until applicable warehousing charges relating to that bale have been paid. U.C.C. § 7–209(1); 7 U.S.C. § 260(j); 7 C.F.R. § 735.29. However, the warehouse's lien is possessory; once the cotton is released, the warehouse loses its lien.[3] "A warehouseman loses his lien on any goods which he voluntarily delivers." U.C.C. § 7–209(4). Admittedly, this is precisely what happened here.

### III.

The Julien Company *was* one of the world's largest cotton merchants, buying and selling around two million bales each year. The Julien Company stored its cotton in several warehouses, including the ones before this Court. Bankers Trust, among others, financed Julien Company's cotton merchandising business; it served as collateral custodian for all of Julien Company's warehouse receipts. In turn, L & S Cotton Systems, Inc., served as Bankers Trust's collateral sub-custodian. In order to perfect its security interest in the Julien Company's warehouse receipts, Bankers Trust, through its agent L & S Cotton Systems, took possession of the receipts. U.C.C. § 9–305. Bankers Trust insists that by so doing, it could exercise dominion and control over the receipts, but did not become the owner of the receipts or the underlying cotton. Bankers Trust asserts that it is not itself a cotton merchant, was not a customer of the warehouses, and never directly paid any of the warehouses for Julien Company's storage charges.

Each warehouse involved in this case stored the Julien Company's cotton and issued negotiable warehouse receipts representing the individual bales of cotton stored. Most of these receipts contain language stating that "[u]pon surrender of this receipt and the payment of all liens due the warehouseman, said cotton will be delivered to the bearer." Most of them also mention the tariffs as specifying charges. Many of the

tariffs, in turn, state that whoever surrenders the receipts will be liable for the storage charges. But, none of the warehouses sent its tariffs to Bankers Trust or its collateral sub-custodian, L & S Cotton Systems. Each warehouse did, however, release and ship the Julien Company's cotton, upon the Julien Company's request and direction, without first being paid by the Julien Company for the accrued storage charges. Because Bankers Trust had possession of the receipts, the Julien Company sent a tag list identifying the cotton and shipping documents to L & S Cotton Systems, who forwarded these along with the receipts to the warehouses. Despite having the legal right to refuse to ship the cotton until their storage charges were paid, the warehouses waived their lien rights by releasing the cotton and invoicing the Julien Company for the charges.

In January 1990, Bankers Trust and two other creditors had the Julien Company placed involuntarily in bankruptcy. At the time, the warehouses had unpaid invoices from the Julien Company dating back six months and totaling over one million dollars; none ever contacted Bankers Trust or L & S Cotton Systems to request payment. Twenty-one of the warehouses involved here were also plaintiffs in adversary proceedings filed in the Julien Company's bankruptcy. They sought to establish a general lien against cotton still in their possession for payment of the same storage charges at issue here; They claimed that the Julien Company owned the cotton, contracted for its storage, and consequently owed the accrued charges. The warehouses' claims were unsuccessful in the bankruptcy proceedings. *Sunflower Compress v. Julien Co.,* 136 B.R. 784 (Bankr. W.D.Tenn.1992); *Bluebonnet Warehouse Corp. v. Julien Co.,* 136 B.R. 765 (Bankr. W.D.Tenn.1992).

On May 24, 1991, while the bankruptcy proceedings were still pending, the warehouses initiated this action in the district court claiming that Bankers Trust owed the storage charges. The warehouses argued

---

**3.** "[T]he specific lien arises only with respect to goods in the 'possession' of the warehouseman. If the warehouseman voluntarily delivers the goods on a promise to pay charges and the

erstwhile bailor thereafter defaults, the warehouseman cannot then demand the goods and reassert his lien." White and Summers, § 21–6 (Vol. 2 at 181).

that because Bankers Trust surrendered the warehouse receipts for shipment of the cotton, it owed the storage charges under a theory of either express or implied contract. In ruling on cross-motions for summary judgment, the district court disagreed. Bankers Trust never expressly agreed to pay the storage charges. The court also found that, based on the undisputed facts, there was insufficient evidence from which a jury could conclude that Bankers Trust implicitly agreed or promised to pay the storage charges upon shipment of the cotton if the warehouses failed to exercise on their liens. The court granted summary judgment in favor of Bankers Trust, from which the warehouses now appeal. In doing so, they seek to circumvent both the specific lien provisions of the U.C.C. and the bankruptcy proceedings.

Before this Court, the warehouses maintain that express or implied contracts exist for the payment of storage charges by virtue of Bankers Trust surrendering the warehouse receipts. They assert that the bases and terms of these contracts are found in the language of the warehouse receipts and the tariffs. Bankers Trust, in turn, contends that if a warehouse waives its lien and does not collect its charges before releasing the cotton, electing instead to invoice the cotton merchant, the warehouse has simply chosen to become an unsecured creditor of the cotton merchant. Bankers Trust insists that it is not the owner of the cotton and no contract exists for the warehouses' storage charges.

## IV.

To begin, Bankers Trust did become the owner of both the warehouse receipts and the underlying cotton when it took possession of the receipts to perfect its security interest. All of the warehouse receipts purchased by the Julien Company were made to "bearer." As such, they were all negotiable bearer documents of title, U.C.C. § 7–104(1)(a), and were negotiated by delivery alone. U.C.C. § 7–501(2)(a). Delivery

means simply the "voluntary transfer of possession." U.C.C. § 1–201(14). Further, as documents of title, if Bankers Trust is a holder[4] to whom the warehouse receipts were "duly negotiated," it acquired both title to the documents and title to the goods. U.C.C. § 7–502(1). A negotiable warehouse receipt is duly negotiated when it is negotiated to a holder who purchases it in good faith, without notice, and for value. U.C.C. § 7–501(4). There is no allegation that Bankers Trust took possession of the receipts without good faith or with notice. Bankers Trust's pre-existing claim constitutes value; possessing the receipts as security for previously extended credit is also in the regular course of financing. U.C.C. §§ 1–201(44), 7–501 n. 1. Thus, the receipts were duly negotiated.

Because the warehouse receipts were bearer documents, Bankers Trust owned the cotton when it took possession of them. As the title-holder, Bankers Trust was subject to the warehouseman's lien. Although to do so may have breached its agreement with the Julien Company, Bankers Trust had the legal right to surrender the receipts to the warehouses at any time and demand the cotton. The warehouses argue that Bankers Trust became contractually obligated to pay the storage charges when its agent surrendered the warehouse receipts at the Julien Company's direction.

The question then becomes whether the warehouse receipts and tariffs may also establish a contract between the warehouses and Bankers Trust. The U.C.C. provides that, unless displaced by a specific provision, principles of law and equity shall supplement the Code. U.C.C. § 1–103. Further, the Code provides that a warehouse may insert any terms not contrary to the Code in a receipt. U.C.C. § 7–202(3). Where bailors and third parties owe storage charges, "the warehouseman has ordinary contract rights to payment enforceable in the courts by action. Under 7–209 and 7–210, such contract rights to payment may be secured by a specific lien.... Of course, if

---

4. Bankers Trust does not dispute whether it is a holder of the warehouse receipts. Indeed, it cites cases for the proposition that a person who becomes a holder of warehouse receipts as collateral security does not become bound for storage charges by reason of having possession of the receipt. *Millichamp v. First National Bank,* 130 Wash. 175, 226 P. 490 (1924); *Driggs v. Dean,* 167 N.Y. 121, 60 N.E. 336, 338 (1901).

for some reason the warehouseman's lien ... is lost or is ineffective, the warehouseman may still assert his contract rights." White and Summers, § 21–6 (Vol. 2 at 179–180). Thus, the warehouse receipt may constitute a contract separate and apart from the warehouseman's lien. Loss of the lien, therefore, does not necessarily mean that a warehouse loses the right to compensation for services rendered. *Jimani Corp. v. S.L.T. Warehouse Co.*, 34 U.C.C. Rep. Serv. 175, 181, 409 So.2d 496, 501 (Fla.App.1982); HAWKLAND, HOLLAND & ANZIVINO, UNIFORM COMMERCIAL CODE SERIES, § 7–209:05 (Vol. 7 at 144). Therefore, if a separate contract for payment exists, it may still be enforced despite waiving the lien.

■ The fact that a contract may exist based on the terms of the warehouse receipts and tariffs does not end our inquiry. Were a contract to exist, for a subsequent holder of the warehouse receipt to become bound by its terms, he must assume the duties and liabilities of that contract. When a contract is assigned, there is a presumption that all rights under the contract are assigned and duties delegated. Restatement (Second) of Contracts § 328(1). This presumption holds true, "[u]nless the language or the circumstances indicate the contrary, *as in an assignment for security.*" *Id.* (emphasis added). An assignment as security, such as was done here when the Julien Company pledged its warehouse receipts to Bankers Trust as collateral, "does not ordinarily delegate performance to the secured party, and the secured party does not assume the assignor's duties." *Id.* comment b; *Newton v. Merchants & Farmers Bank of Dumas*, 11 Ark. App. 167, 668 S.W.2d 51, 53 (1984). Indeed, there is no indication in the record that Bankers Trust ever intended to assume the Julien Company's duty to pay the cotton storage charges. The very purpose of the assignment—to perfect a security interest—goes against such a presumption. *Poindexter v. National Mortgage Co.*, 1995 WL 242287, *11 (N.D.Ill. April 24, 1995).

Although a warehouseman does not forfeit contractual obligations by waiving a specific lien, we do not find that Bankers Trust has any contractual obligation to pay the storage charges for the Julien Company's cotton; there has been no showing of either an express agreement on Bankers Trust's part or an implied contract based on L & S Cotton Systems surrendering the receipts to the warehouse. As the district court found, "no promise to pay the storage charges can be implied from the simple exercise by [Bankers Trust] of its lawful right to surrender the receipts and to compel the release of the cotton underlying the warehouse receipts subject to payment of the liens, if requested." No such request was made. The warehouses released the cotton, waived their specific lien, and now seek to create a contract where none was intended to recoup their lost storage charges. The Uniform Commercial Code intended that warehouses retain possession of stored goods until the warehouses' lien is satisfied and gives them the legal right to do so. Unfortunately, the warehouses in this case did not enforce their liens. Moreover, they did not even release the cotton on condition of payment by a third party, Bankers Trust, but simply invoiced the cotton merchant. Bankers Trust is therefore not legally obligated to pay the warehouses storage charges.

Judgment AFFIRMED.

MERRITT, Chief Judge, dissenting.

The Court has concluded that Bankers Trust is not liable to the warehouses for storage charges under any contract theory. Even if this were correct, and I have my reservations as to that proposition, the Court has failed to consider the argument of the warehouses that the summary judgment papers establish a valid common law claim in restitution for unjust enrichment of Bankers Trust at their expense. This claim, referred to below as a claim for breach of "implied contract," was hazy and ill-formed at the trial level. The court below failed to mention or deal with it in its opinion. In its original appellate brief the warehouses at page 28 referred briefly to it as a claim that Bankers Trust "benefitted unjustly from these actions and in fact has been unjustly enriched by its own wrongful actions." At oral argument the Court recognized that the warehouses were trying, however unartfully, to describe

a claim in restitution and asked that the parties file supplemental briefs of this theory of liability. The parties, including two amici representing large banking institutions, have now filed supplemental briefs on this point. Because I believe that the court below should be reversed, and that this case should be tried under a theory of restitution, I respectfully dissent.

## Equitable Remedies and the U.C.C.

If in a case such as this, as the majority has concluded, an express contract does not exist, a court should follow common law doctrines of restitution, sometimes referred to as "implied contract," "quasi-contract," "quantum meruit," or "unjust enrichment," to insure in certain circumstances that a party who has conferred a benefit on another is allowed to recoup its costs. These common principles of restitution, by whatever name, are now well accepted in the law, as Dean John W. Wade elaborated in a seminal article collecting cases thirty years ago:

> The principle is now fully recognized in this country that a "person who has been unjustly enriched at the expense of another is required to make restitution to the other." This is the language of the first section of the *Restatement of Restitution.* When one person confers a benefit upon another without the latter's solicitation, the benefit received constitutes an enrichment—a windfall, so to speak. This benefit may take one of several forms. It may involve (1) transferring property to the defendant, (2) saving, preserving or improving his property, (3) rendering personal services for him, or (4) performing for him a duty imposed directly by law or by his own contractual arrangements.

John W. Wade, *Restitution for Benefits Conferred Without Request,* 19 Vand. L.Rev. 1183 (1966).

Bankers Trust, as defendant, and the Commercial Finance Association and the New York Clearing House, as Amici Curiae on behalf of a large number of large banks, have argued in several different way one basic proposition: A secured creditor (a bank) should never be liable in restitution for benefits voluntarily conferred on it by an unsecured creditor (a warehouse or other supplier of goods and services). They argue that lending institutions should be exempt from the doctrine of unjust enrichment because otherwise equitable principles might upset the limited liability intended for banks under the U.C.C. The basic thrust of this categorical argument for the exemption of banks is concisely stated in the brief of the New York Clearing House at page 4:

> Disruption of the clear rules of the UCC [by application of principles of restitution] would undermine a commercial lender's ability to predict whether and to what extent it can obtain repayment of its loans. This uncertainty in turn would increase financing costs and, in some cases, lead to an unwillingness to provide financing to manufacturers and merchants.

There are several problems with this argument. *First,* even if it could be said somehow that *secured creditors* are a special class that generally speaking should be exempt from the law of restitution, that characterization does not accurately describe the Bank's transactions here. The Bank took complete title to the cotton with power to exercise control over it, and it fully exercised such control knowing that the warehouses expected payment for storage. The Bank was the owner of the cotton, and it should be treated as any other bailor of goods that are preserved by the bailee at a significant cost. The banks have cited no case in which a lending institution became the owner of goods, as here, and was exempt from the normal principles of restitution. The reason there is no case so holding is that the Rule of Law would be undermined by an exemption for banks from the principles of fair dealing that all other institutions and individuals must observe. There is no reason to exempt the most powerful institutions in our society from laws that ordinary people must obey.

*Second,* the banks are wrong in asserting that this decision would undermine a lender's ability to predict recovery value on its loans. When Bankers Trust issued loans to the Julien Company, secured in part by warehouse receipts for cotton, the Bank knew that the warehouse receipts were worth only the value of the cotton minus any storage charges that would have to be paid before

the cotton was released. The Julien Company's bankruptcy has to this point given the bank a windfall for the amount of the storage charges, an amount that no reasonable lender would have expected to collect at the time the loan was issued.

*Finally,* and most importantly, the argument that recovery on a restitution theory is never available in a case governed by the Uniform Commercial Code belies the explicit language of the Code. Section 1–103 states:

> Unless displaced by the particular provisions of chapters 1–9 of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

Tenn.Code Ann. § 47–1–103 (1992). Thus, the warehouses in the present case are not barred from proceeding on a theory of unjust enrichment unless a particular Code provision explicitly displaces that equitable remedy. *See id.* cmt. 1 (stating that "this section indicates the continued applicability to commercial contracts of all supplemental bodies of law except insofar as they are *explicitly* displaced by this Act") (emphasis added). The theory of § 1–103 is contrary to the Bank's categorical contention that the warehouses as unsecured creditors must necessarily subsidize the Bank as a secured creditor by preserving its collateral without restitution.

Although a large number of commercial legal principles have been displaced by specific U.C.C. provisions, the rules of equity have not been so thoroughly subsumed by the Code. This is due to the distinct nature of legal and equitable rules and the effect of codification upon them. A primary function of any codification of common law, including the Code, is to displace prior *legal* rules. The same cannot be said of prior *equitable* principles. Equity was developed to do justice in individual cases by carving exceptions to and otherwise modifying legal rules. Thus, a codification of legal rules does not automatically displace the equitable principles which supplement them. See the exten-

sive discussion of this point in 1 James J. White and Robert S. Summers, *Uniform Commercial Code* § 5 at 19–20 (3d pract. ed.1988) and Robert S. Summers, *General Equitable Principles Under Section 1–103 of the Uniform Commercial Code,* 72 Nw. U.L.Rev. 906, 908–13 (1978). See also the discussion of the equitable rights of the unsecured creditor versus the secured creditor from a law and economics perspective in Lynn M. Lopucki, *The Unsecured Creditor's Bargain,* 80 Va. L.Rev. 1887 (1994).

Bankers Trust argues that U.C.C. section 7–502 specifically displaces the warehouses' unjust enrichment claim. That section lists the rights acquired by a holder to whom a warehouse receipt has been duly negotiated, and states that such a holder receives, in addition to title to the document and title to the goods, "the direct obligation of the issuer to hold or deliver the goods according to the terms of the document *free of any defense or claim by him* except those arising under the terms of the document or under this chapter." Tenn.Code Ann. § 47–7–502(d) (emphasis added). Because neither the warehouse receipt nor Article 7 specifically grants equitable remedies to the warehouses, the Bank argues that it should receive the cotton free of any such claim. However, section 7–502 must be read in conjunction with section 7–210. The latter provision, which explains the workings of the warehouseman's lien, clearly states that the lien is not a warehouse's exclusive avenue of recovery from a receipt holder, but rather is a right "in addition to all other rights allowed by law to a creditor against his debtor." Tenn.Code Ann. § 47–7–210(7). Thus, Article 7 does not displace equitable remedies for warehouses against receipt holders; instead, and in harmony with the general directive of 1–103, it explicitly acknowledges that non-Code remedies can be employed.

Bankers Trust also makes the more general assertion that equitable claims, and specifically claims for unjust enrichment, should not be cognizable in cases in which they might produce results at odds with the priority system established in Article 9. The bank claims that this is a "majority rule" and cites several cases which may support this broad

proposition. It is true that in *Peerless Packing Co. v. Malone & Hyde, Inc.*, 180 W.Va. 267, 376 S.E.2d 161 (1988), the secured creditor of a grocer's inventory was allowed to prevail over unsecured creditors who claimed unjust enrichment for groceries delivered to an insolvent debtor. Also, in *Evans Products Co. v. Jorgensen*, 245 Or. 362, 421 P.2d 978, 983 (1966), the court said that "[t]he purpose and effectiveness of the UCC would be substantially impaired if interests created in compliance with UCC procedures could be defeated by application of the equitable doctrine of unjust enrichment." I am not persuaded by these cases, which ignore the clear command of section 1–103 that equitable principles will apply unless specifically displaced. A secured creditor will not always be *unjustly* enriched by actions of an unsecured creditor that increase the value of the secured party's collateral, but the Code does not categorically reject the possibility that a secured lender could be unjustly enriched and forced to make restitution on that account. The contrary view of other state courts is much more consistent with the code and a system of fair dealing by banks, *see, e.g., Ninth District Production Credit Ass'n v. Ed Duggan, Inc.*, 821 P.2d 788 (Colo.1991); *Producers Cotton Oil Co. v. Amstar Corp.*, 197 Cal.App.3d 638, 242 Cal.Rptr. 914 (1988).

**Application of the Law of Unjust Enrichment to this Case**

Under Tennessee law,[1] recovery for unjust enrichment[2] is allowed where: 1) plaintiff confers a benefit upon defendant; 2) defendant appreciates the benefit; 3) defendant accepts the benefit; and, most importantly, 4) it would be inequitable for defendant to retain the benefit without paying for it. *Paschall's Inc. v. J.P. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 155 (1966). A more specific form of this rule, directly applicable to the circumstances of this case, is found in section 117 of the Restatement of Restitution, which outlines the principles of liability when one's property or credit is preserved by another. No categorical exemption is given to banks as secured creditors:

**§ 117. Preservation of Another's Things or Credit.**

(1) A person who, although acting without the other's knowledge or consent, has preserved things belonging to another from damage or destruction, is entitled to restitution for services rendered or expenditures incurred therein, if

(a) he was in lawful possession or custody of the things or if he lawfully took possession thereof, and the services or expenses were not made necessary by his breach of duty to the other, and

(b) it was reasonably necessary that the services should be rendered or the expenditures incurred before it was possible to communicate with the owner by reasonable means, and

(c) he had no reason to believe that the owner did not desire him so to act, and

(d) he intended to charge for such services or to retain the things as his own if the identity of the owner were not discovered or if the owner should disclaim, and

(e) the things have been accepted by the owner.

Restatement of Restitution § 117(1) (1937).

It is hornbook law that the courts will not imply a contract between parties where an express contract already exists. *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn.Ct.App.1991). Because the Court has decided that no express contract existed between Bankers Trust and the warehouses, this rule would not be a barrier to finding an implied con-

---

**1.** Though many of the warehouses involved in this case are not situated within Tennessee, there has been no suggestion by any of the parties that any law other than Tennessee's should apply. The Julien Company's cotton transactions occurred in Tennessee, as did its transfer of the warehouse receipts.

**2.** The Tennessee Supreme Court has recognized that "[a]ctions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same," and that courts use each of these various names to "describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between parties, regardless of their assent thereto." *Paschall's Inc. v. J.P. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 154 (1966).

tract in the present case. However, a related rule exists, which Bankers Trust has argued is applicable here:

> A person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of performance by the third person.

Restatement of Restitution § 110 (1937) ("Restitution From Beneficiary of a Contract with Third Person Who Has Failed to Perform"). Section 110 finds expression in Tennessee law in the rule that "an implied undertaking cannot arise against one benefited by the work performed, where the work is done under a special contract with another." *Paschall's,* 407 S.W.2d at 154. An important caveat, however, is that this "general rule" is not applicable in those cases where the express "contract becomes unenforceable or invalid." *Id.* at 154–55.

*Paschall's* is instructive. The case involved an action by a contractor to recover for materials and labor furnished in the construction of an addition to a house. The addition was performed under contract with the daughter of the homeowner. The contractor, unable to recover from the daughter, sued the homeowner/parent on a theory of unjust enrichment, and the Tennessee Supreme Court remanded the case to the trier of facts to allow this theory to proceed. In *Paschall's,* as here, the plaintiff had lost its right to recover under a statutorily granted lien. 407 S.W.2d at 152. The court held that this did not preclude an unjust enrichment recovery. *Id.* at 153. Additionally, the existence of an express contract between the plaintiff and the daughter did not bar the possibility of an equitable remedy where the contract became unenforceable due to the daughter's bankruptcy. *Id.* at 152, 154–55. In the present case, the warehouses have been unable to recover from the bankrupt Julien Company. Thus, the fact that Bankers Trust may have been a third-party beneficiary of a now-unenforceable contract between the warehouses and the Julien Company does not preclude the warehouses from raising an unjust enrichment claim against the bank.

A final argument made by Bankers Trust against the employment of equitable remedies against it by the warehouses is that it was not the owner of the cotton and, therefore, any benefit it received was only an indirect benefit, identical in nature to that received by any secured creditor due to an unsecured creditor's preservation or enhancement of the secured party's collateral. This argument is misplaced for two reasons. First, Bankers Trust was, as a holder of negotiable warehouse receipts for the cotton, the owner of the cotton under Article 7. *See* Tenn.Code Ann. § 47–7–502 ("a holder to whom a negotiable document of title has been duly negotiated acquires ... title to the goods"). Additionally, title to the goods does not appear to be a necessary element of unjust enrichment under Tennessee law. The correct question is whether Bankers Trust had a benefit conferred upon it by the warehouses, *see Paschall's,* 407 S.W.2d at 155, and this is a question for the finder of fact.

Because the U.C.C. does not bar the warehouses' "implied contract" or restitution claim against Bankers Trust, on this appeal from summary judgment, the proper inquiry for this Court should be whether a reasonable finder of fact could conclude that the facts, when taken in the light most favorable to the warehouses, would allow recovery under a theory of unjust enrichment. It is clear that a finder of fact could so conclude, under the theory of unjust enrichment given in *Paschall's* or, more specifically, in section 117 of the Restatement of Restitution. Section 117 is particularly helpful because, rather than simply stating that the most important factor for a restitutionary recovery is whether the enrichment at issue was unjust, it gives specific standards for determining when the preservation of another's things should be compensable.

The facts in the appellate record suggest that: The warehouses, in lawful possession of the cotton, acted to store and preserve the cotton for the benefit of the Bank as owner of the cotton without the express consent of the Bank. The benefit was not forced on the Bank against its will. When the Bank ceased taking warehouse receipts and fund-

ing the Julien Company, and then placed it into involuntary bankruptcy, it was well aware that the warehouse charges were unpaid and that it had accepted the benefit of their storage services. The benefits were conferred on the Bank before the warehouses received letters of notification that the Bank had become the owner of the cotton through transfer of the warehouse receipts by the Julien Company to the Bank. The warehouses had no reason to believe that the owner of the cotton did not want the warehouses to preserve the cotton from loss or damage. The warehouses intended to charge a storage fee for their services, and the Bank as owner acknowledged and accepted ownership of the cotton. In each instance before shipment of the cotton, the Bank established a commercial relationship with the warehouse. Each time it wrote a letter to the warehouse giving the shipping instruction and saying that "the documents [warehouse receipts showing ownership in the Bank, bills of lading, and shipping instructions] were at all times to be held and handled by you in trust for our account." The Bank as owner had complete control over the warehouse receipts and hence complete control of the cotton. The Bank, as owner of the cotton, directly and knowingly requested by letter and used the services of the warehouses. Thereafter, the Bank accepted the proceeds for the sale of the cotton which the warehouses had preserved.

A finder of fact, based on the above alleged facts, could conclude that Bankers Trust was unjustly enriched by the warehouses for the value of the storage costs not paid by the Julien Company. The fact finder would not have to find *unjust* enrichment. Although the Court has held that the warehouse receipts made the Bank the owner of the cotton, in deciding whether the enrichment was unjust, the finder of fact should consider, and might credit, the Bank's claim that at all times it acted only as a normal secured creditor. In this regard it should be noted that, had the bank physically held the cotton as collateral, it would have incurred storage costs as a part of its independent duty under the U.C.C. to use "reasonable care in the custody and preservation of collateral in [its] possession." Tenn.Code Ann. § 47–9–207(1). *See Knox v. Phoenix Leasing Inc.*, 29 Cal. App.4th 1357, 35 Cal.Rptr.2d 141, 148 (1994) (citing § 9–207 and stating that, where collateral is perishable, "the unsecured status of the creditor appears less important than the fact that the secured creditor directly benefits from expenditures the creditor is spared having to make on its own behalf"). Also important to the question of unjust enrichment would be whether it was a reasonable custom of the cotton marketplace for the warehouses to waive the statutorily-granted liens that would have allowed them to collect storage costs before releasing the cotton.

The precise scope of inquiry that a finder of fact should undertake in a case such as this is highlighted by reference to the source of disagreement between the majority and dissenting justices in *Ninth District Production Credit Ass'n v. Ed Duggan, Inc.*, 821 P.2d 788 (Colo.1991). In *Duggan* an unsecured supplier of corn to a feed lot brought an unjust enrichment claim against a secured creditor who held a properly perfected security interest in the feed lot's assets. The Supreme Court of Colorado, sitting *en banc*, agreed with the trial and intermediate appellate courts that an unjust enrichment claim was not automatically precluded by the secured creditor's possession of an interest given priority under the Uniform Commercial Code. The court articulated a standard: "Where a secured creditor is benefitted by a transaction between its debtor and an unsecured creditor that enhances the value of the secured collateral, and the secured creditor initiates or encourages the transaction, the secured creditor can be held liable to the unsecured creditor on the theory of unjust enrichment." *Id.* at 801. The court reversed and remanded the case to clarify that: 1) the secured creditor must initiate or encourage the transaction in order for the enrichment to be unjust, and 2) the jury instructions should explain the interrelation of the doctrine of unjust enrichment and Article 9 of the U.C.C. The dissent claimed that the majority's standard imposed requirements not otherwise found in the law of equity, and that the U.C.C. status of the parties was irrelevant to the case. *Id.* at 804 & n. 7. Both the majority and dissent make good

 

points, but neither is entirely correct as I understand the law of implied contract.[3]

I disagree with *Duggan* majority's contention that a secured party must "initiate or encourage the transaction" before an unsecured creditor can ever recover on a theory of unjust enrichment. As conceded in *Duggan* itself, acquiescence by the secured creditor might be enough if the unsecured creditor's actions were necessary to preserve the secured collateral. 821 P.2d at 797 n. 7 (citing *Producers Cotton Oil Co. v. Amstar Corp.*, 197 Cal.App.3d 638, 242 Cal.Rptr. 914 (1988)). Also, the "initiate or encourage" element is contrary to Restatement of Restitution § 117, which does not require the party benefited to have initiated or encouraged the transaction. I agree with the *Duggan* majority, however, that the finder of fact should be informed of the U.C.C. status of the parties as a factor in deciding whether a secured party's retention of a benefit conferred by an unsecured party would be inequitable. The dissent's position that a party's status as a secured creditor is "not relevant" to whether an implied contract exists would not give the finder of fact the information with which to judge the true inequity of a transaction.

The District Court was therefore in error in this diversity case in granting summary judgment to the Bank on the restitution or implied contract claims of the warehouses. Based on *Paschall's* and other restitution cases, Tennessee courts would apply the principles of § 117 of the Restatement of Restitution, which preclude summary judgment and require submission of the claim to the fact finder for resolution.

---

**3.** Some confusion may be based on the difference between a contract implied in fact and one implied in law. A contract implied in fact is akin to an express contract; it is based on a tacit, rather than a stated or written, agreement between the parties, and ordinary rules of contract law apply. Contracts implied in law are cre-ations of equity, and are not based upon the *intention of the parties to contract. See Paschall's,* 407 S.W.2d at 154. Still, the intentions of the parties and the overall background of the transaction can be important to the determination of whether the enrichment alleged in an implied contract claim is unjust.